**STATE of Tennessee, Respondent,**

v.

**William Earl STACY, Petitioner.**

Supreme Court of Tennessee.

June 30, 1980.

Walter C. Kurtz, Richard McGee, Nashville, Martha Meares, Knoxville, for petitioner.

William M. Leech, Jr., Atty. Gen., Michael J. Passino, Asst. Atty. Gen., Nashville, Ronald A. Webster, Dist. Atty. Gen., John W. Gill, Jr., Asst. Dist. Atty. Gen., Knoxville, for respondent.

OPINION

HARBISON, Justice.

Petitioner was convicted of murder in the first degree and sentenced to life imprisonment in the state penitentiary. The Court of Criminal Appeals affirmed the conviction. Although a number of assignments of error were made in the petition for certiorari to this Court, the petition was granted primarily to consider the sufficiency of the convicting evidence in light of petitioner's defense of lack of mental capacity.

This case involved a planned, deliberate robbery and a murder committed by petitioner in the perpetration of it. Petitioner was driven to the scene of the crime by two other persons. Neither of these individuals claimed mental illness or inability to control his conduct. In the course of attempting to commit the robbery, petitioner shot and killed the intended victim. He was aware of what he had done immediately thereafter, recognized that he had killed the victim, and actively sought to avoid apprehension by the police. He was successful in doing so, even though his two companions were not. Petitioner evaded capture for several weeks. The offense occurred in Knoxville. Petitioner came to Nashville and was seen there on several occasions by persons who had known him previously. He recognized these persons and recalled past events in conversations with them.

Petitioner had a fairly short history of mental illness, dating, not from his childhood, but for a period of about one year prior to the crime in question. There is evidence that he was highly intelligent. It is conceded by counsel for petitioner that there was sufficient evidence to make a jury issue in this case as to whether the accused did or did not appreciate the wrongfulness of his conduct.

Reversal is sought on the other prong of the rules of criminal responsibility as stated in *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977); that is, inability of petitioner to control his conduct.

■ In the opinion of the majority, that issue, like the issue of cognitive capacity, was a question of fact to be determined by the jury. There was evidence that the accused, when he had been removed from medication for a considerable period of time, became completely irrational. At the time of the homicide, however, he had been without medication for only a short period of time, if at all, and his conduct on or about the time of the murder does not compare even remotely with the conduct described when he was totally psychotic or out of touch with reality. In our opinion, it was for the jury to determine whether petitioner could or could not control his conduct. If he could not control it at the time when he committed the shooting a few hours earlier, it is difficult to conceive that he could have effectively escaped from a wrecked vehicle and eluded captivity for weeks thereafter—or, at least, a trier of fact might reasonably so conclude from the proof.

■ The jurors in this case were given full instructions on the rules of criminal responsibility pursuant to *Graham v. State, supra.* Presumably the facts were fully argued to them, as they were to this Court. The jury and the trial judge, all of whom saw and observed the witnesses, concluded that the accused was not incompetent within the *Graham* rules, and in our opinion there was ample material evidence to support that conclusion.

■ Petitioner's case has been before the appellate courts on another occasion. *See State v. Stacy*, 556 S.W.2d 552 (Tenn. Cr.App.1977). His drug therapy was discussed in that case. It is clear both from that opinion and from the record in the present case that his ability to control his conduct varied with the degree and extent of medication which he received and the length of time he was without it. In our opinion, it was for the jury to say whether or not, at the time of the homicide, he had been without medication for a sufficiently long period of time to be unable to control his conduct. The fact that he was seen in Nashville a substantial period of time later and recognized and conversed with persons whom he knew, apparently in control of himself, is evidence from which the jury could have concluded that petitioner was not psychotic or out of control at the time of the homicide involved here.

■ The testimony of experts offered on behalf of petitioner was opinion evidence only. Its weight and credibility were clearly issues to be determined by the jury under appropriate instructions from the trial judge. One of these witnesses, Dr. Luton, did not see petitioner until April 1976, over eight months after the homicide in ques-

tion. The other, Dr. Siegmann, had observed him during the years 1974 and 1975. He testified that on July 1, 1975, petitioner was discharged from the Forensic Services Unit as being improved. At that time petitioner was on medication. Thereafter he was in custody and in the Eastern State Hospital until July 23, 1975. Dr. Siegmann testified that if petitioner discontinued his medication, his condition "would disintegrate relatively soon again." It was for the jury, in our opinion, to say what "relatively soon" meant and to determine whether the petitioner's condition had deteriorated by July 30, 1975, the date of the crime, and the extent of such deterioration, if any. He was out of the hospital and without supervision for only seven days before the murder was committed. Dr. Siegmann did not see petitioner again after July 1 until March 9, 1976, over seven months after the homicide. He expressed the opinion that the accused could appreciate the wrongfulness of his conduct at the time of the crime but that petitioner could not control that conduct or conform it to the requirements of the law. He described the conduct of petitioner when he was in a state of disintegration. The jury was entitled to compare that conduct with the demeanor of the petitioner at or about the time of the robbery and homicide. Further, Dr. Siegmann testified positively that petitioner is not mentally retarded and that his intelligence is well above the average range.

In this Court, the evidence must be viewed in its strongest light favorable to the verdict. It is not the function of this Court to draw inferences from testimony in jury cases. That is the province of the jury whose verdict, in our opinion, was justified from the evidence in the record.

The judgments of the Court of Criminal Appeals and the trial court are affirmed at the cost of petitioner.

BROCK, C. J., and COOPER, J., concur.

HENRY and FONES, JJ., dissent.

1. While we do not choose to belabor the issue we reject the implication of the Majority's assertion that this was a "planned" criminal event. Whatever the activity of his two companions, the defendant did not have the mental

## DISSENTING OPINION

HENRY, Justice, dissenting.

We granted certiorari in this case for the sole purpose of considering the issue of insanity.

Petitioner was convicted of murder in the first degree and sentenced to serve life imprisonment in the state penitentiary. We find that the defendant's insanity at the time of the commission of the crime was established beyond any reasonable doubt. Accordingly, we would reverse.

The details of the murder are of no significance to the issue under consideration.[1] The offense was committed on July 30, 1975, seven days after the defendant had been discharged from a state mental hospital. He and two companions entered the Knoxville bus station where defendant shot and killed a ticket clerk. All fled and, after being pursued by the police, defendant's two companions were captured. Defendant escaped in a weed field and was captured some three weeks later.

The precipitating factor and proximate cause of this tragic and senseless murder was the action of Eastern State Hospital in releasing this dangerously mentally ill individual, who was hospitalized on court order, *without the knowledge of the court of commitment, without medication and without any arrangement for out-patient or follow-up care.* This slaying occurred seven days after his release, and at a time when he was off medication because none had been prescribed for him.

On January 31, 1977, this Court released its *unanimous* opinion in *Graham v. State*, 547 S.W.2d 531, adopting a new and enlightened rule for the determination of criminal responsibility. We pointed out the failure of our courts to address the "nature and quality" prong of the old *M'Naghten*

ability to plan any course of action or the gumption to carry any plan into execution. Witnesseth the fact that he did not bother to get the money, the fruits of the robbery.

rule, relying instead and solely upon the "right and wrong" portion. 547 S.W.2d at 541. We held the *Graham* test to be "essentially a refinement and restatement of the *full M'Naghten* rules." (Emphasis supplied) *Id.*

The opinion the Majority released today erodes the *Graham* rules and effectively takes us back to the old, outmoded and rejected "right and wrong" test. In a very real sense it even obliterates *M'Naghten.* In effect, the Majority's action proclaims that the defense of insanity is available only to a criminal defendant who can prove that he is a "wild beast," with the limitation that if he has sense enough to run and hide, he is legally responsible for his criminal conduct.

We submit that this record shows clearly, convincingly and conclusively to a moral and legal certainty that this defendant was legally insane under any reasonable and logical application of any test of criminal responsibility.

We document the record.

## I.

### Mental Health Background

Defendant's background of hospitalization is significant. He was first admitted to the Forensic Services Division at Central State Hospital on August 13, 1974, from the state penitentiary, where he was serving a sentence for burglary and shoplifting. On October 18, 1974, he was transferred to Eastern State Hospital, from which he was discharged on October 23, 1974. On March 5, 1975, he was again admitted to Central State Hospital from the Criminal Court at Knoxville. On July 8, 1975, an incompetency and commitment hearing was conducted before the Honorable Richard R. Ford, Circuit Judge, and, as a result, on July 10, 1975, he was admitted to Eastern State Hospital for an indefinite period.

Judge Ford testified in this case as a witness for the defense. It was his testimo-

ny that based upon his personal observation on July 8, 1975, and on the information available, the defendant was seriously mentally ill. This was twenty-two days before the murder.[2]

On July 23, 1975, seven days before the murder, defendant was discharged from Eastern State Hospital without medication and without any provision for follow-up care.

## II.

### Lay Testimony

Defendant's sister, Kathy Stacy, testified that upon discharge defendant was so badly deteriorated that she thought he had escaped and called the hospital to confirm the fact of his discharge. She describes his conduct during the week between the discharge and murder as featuring giggling, laughing inappropriately, nervousness, shaking, staring, and having hallucinations of ghosts. On one occasion he turned out the lights so she could see the ghosts. He randomly broke dishes, walked naked about the house in front of his sister, her children and guests, and put an unloaded pistol against the head of her son and told him he would "blow his brains out." *On the day of the crime* he returned to her house with his "eyes all glittery," laughing, giggling and unable to stand still.

The testimony of Ira Minifee, an indicted accessory, and Regina Mack, both witnesses for the State, fully supports defendant's plea of insanity. Their descriptive testimony related to the *very day of the murder* and fully supports the testimony of Kathy Stacy. Further, it is consistent with and corroborative of the observations of the medical experts. In the very teeth of the crucial and undisputed testimony of these three witnesses, and with no evidentiary support in the record, the Majority asserts that "his conduct on or about the time of the murder does not compare even remotely with the conduct described when he was

2. Judge Ford also testified that he was not even notified of the release of this prisoner whom he had committed.

totally psychotic or out of touch with reality."

Reginald Leverette, a fellow prisoner for about four months following the murder, told of defendant's various acts of bizarre conduct, including a fixation that he was a member of the President's Cabinet, waking from his sleep laughing, and walking about his cell naked with toilet paper sticking out his nose. His testimony states the defendant's condition in terms of thundering eloquence. He says defendant "ain't got good sense, he's crazy."

Stripped of all technical terminology this is precisely what the medical experts say. While this case is, in no sense, wholly dependent upon psychiatric testimony, the testimony of the medical witnesses gave thundering support to the defendant's plea of insanity.

### III.

#### Medical Testimony

John T. Gerdes, Director of the Forensic Services Division at the Middle Tennessee Mental Health Institute,[3] a graduate psychologist with work completed on his doctorate at Vanderbilt, had personally observed and evaluated defendant on each of his three admissions. He confirms the lay witnesses on the glassy stare, the inappropriate laughter, the silly smile and other bizarre conduct.

He described the defendant thusly:

I considered him to be a *chronic type* mental patient who has periods when his condition is in remission such that he doesn't appear as such outwardly psychotic but he's *always mentally ill.* (Emphasis supplied).

The defendant called Dr. Frank L. Luton, the Assistant Superintendent for Clinical Psychiatric Services at the Middle Tennessee Health Institute. Dr. Luton has practiced psychiatry for forty-eight years. His career has been remarkable. His background includes graduation from the Medical School at Vanderbilt, four years of postgraduate training at Johns Hopkins, training in London, further training in Boston and as a teacher of psychiatry at Vanderbilt. He has been professor emeritus at Vanderbilt since 1963. We consider his testimony to be significant and conclusive.

Dr. Luton was thoroughly familiar with all records pertaining to defendant and had interviewed and evaluated him on numerous occasions. He diagnosed his condition as "schizophrenic, *chronic* undifferentiated type." The word "chronic" is defined in *Dorland's Medical Dictionary*, 25th Edition (1974) as "persisting over a long period of time." Thus, definitionally, no valid comparison may be made with a "cyclic, periodic or episodic" disorder such as we dealt with in *Forbes v. State*, 559 S.W.2d 318 (Tenn.1977).

Dr. Luton's testimony sheds substantial light on the medication question. He testified that "[w]hen he's not medicated, he becomes grossly psychotic, grossly ill, mentally ill." He testified that with medication defendant "behaves in a relatively normal fashion," but that he cannot be trusted to take his medication—"[h]e gets the idea that he doesn't need it any longer."

Basing his testimony on his own examinations he voiced the opinion that at the time of the murder defendant "was mentally sick, seriously, at that time." He testified that his condition was "chronic" and that it "goes back to the time when he committed the act and [that] at that time he was *not able to judge the nature of his act.*" (Emphasis supplied). Further, he was "not able to conform" his conduct to the requirements of the law. It is evident from Dr. Luton's testimony that defendant is dangerously psychotic when off his medication and yet he was released from the East Tennessee Mental Health Institute (Eastern State Hospital) without medication. As Dr. Luton phrased it, "the minute he quits taking his medicine, he's losing ground."

---

**3.** The present name of Central State Hospital, a designation sometimes used in this opinion to conform to trial usage.

The testimony of Dr. Cyrus H. Higgs, Jr., at the July 8, 1975 hearing before Judge Ford appears in the record by agreement. Dr. Higgs was, at the time, Assistant Superintendent for Forensic Services at Central State Psychiatric Hospital. He had observed and evaluated defendant while at Central State. He testified to *chronic* schizophrenia and to the danger of a "relapse" without medication. Based on defendant's condition in December 1974 and assuming its continuance, Dr. Higgs felt that *"even under the McNaughten Rule that he would have an insanity defense."*

Petitioner's last witness was Adolf Siegmann, formerly a psychiatrist at Central State Hospital, now at the Veteran's Administration Hospital in Murfreesboro. His testimony was based upon observations from April to August 1974, from March until July 1, 1975, and March 1976 to March 1977—all at Central State.

He testified unequivocally that defendant is mentally ill. He spoke of his "giggling in completely inappropriate ways," a condition defendant demonstrated to his sister and other lay witnesses from the date of discharge to the day of the murder. He said that this was "truly a sign of mental disease." He spoke of the smiles, the hallucinations and inappropriate behavior, also observed by the sister and other lay witnesses on the very day of the murder and during the preceding week.

According to Dr. Siegmann there had been symptomatic improvement in defendant's condition by July 1, 1975, when he was transferred to Eastern State, as a result of the "decisive" role played by medication. But "it was very important that his medication be maintained as Mr. Stacy's condition is apt to deteriorate if this is not done." If he were released without medication he "would disintegrate relatively soon again."

Dr. Siegmann testified that defendant was sent back to Eastern State for that institution to "supply support systems prior to discharge" and the "maintenance of medication." When asked if defendant could have been discharged into the community during the month of July 1975, the doctor responded: "I can only say that I was surprised when I heard about it."

Dr. Siegmann testified that defendant was aware of the wrongfulness of his action but said that "[t]he patient does not lose all semblance of what he was doing, which means in some ways a vague reality situation is almost always the awareness of a schizophrenic." He testified that defendant could not conform his conduct to the requirements of the law. He explained this by saying that a person in his condition is not "truly in command of his reasoning as a normal person." He becomes the victim of his affect, of which he is neither really aware nor, if he is aware, understands. He is bound to all kinds of impulsive actions which at times earlier he might renounce as "[in]appropriate."

Finally Dr. Siegmann was asked "what happened to him during the last several years when he has not taken his medication," to which Siegmann responded, "[h]e became psychotic. *Dorland's* defines psychosis as being "any major mental disorder of organic and/or emotional origin characterized by derangement of the personality and loss of contact with reality. . . . ."

The descriptions given by the sister and other lay witnesses take on new significance, in view of Dr. Siegmann's testimony:

Q. Doctor, based on your knowledge of Mr. Stacy, if it were brought to your attention that on a given day he had been extremely nervous, could not stay still, had been laughing and giggling inappropriately, would that indicate to you that his state of schizophrenia was in remission or was it active?"

A. I would think it was a recurrence of disintegration.

This medical and lay testimony clearly establishes that defendant was not in remission on the date of the murder because he was not taking his medication, without which he was "basically mentally ill" and "grossly psychotic, grossly ill, grossly mentally ill," or, in the idiom, he "ain't got good sense, he's crazy." The Majority asserts

that "[a]t the time of the homicide, however, he had been without medication for only a short period of time, *if at all*." The only conceivable purpose of this assertion is to cast doubt upon the absolute and undisputed fact that defendant was released without medication and was not on medication at the time of the murder.

The State called a single witness in rebuttal, Dr. J. Frank Beasley, a psychiatrist employed by Lakeshore Mental Hospital. In response to a rambling, court-supplemented, lawyer-amended hypothetical question of questionable competence, Dr. Beasley testified that this hypothetical individual realized what he was doing and that it was wrong. All remaining portions of his testimony were properly stricken by the trial judge.

It is significant to note that Dr. Beasley was not asked a single question about remission. It is more significant that the State did not call a single psychiatrist from Central State or Eastern State, where the psychiatric treatment had been given defendant for a substantial portion of the year preceding the murder.

Normally, the missing witness rule would come into play and an unfavorable inference might be drawn from the State's failure to call an available witness possessing peculiar knowledge of the facts, relying instead on a witness less familiar with them. This is true especially in view of the fact that the State had within its keeping the psychiatrists who administered to defendant during his confinements at the state mental institutions. There is, however, no necessity for relying upon this inference. During oral argument the following colloquy between the Court and counsel for the State occurred:

> The Court: Instead of calling one of those witnesses who had full knowledge of the facts, witnesses who were in the keeping of the state, the state elected to rely upon a hypothetical question propounded to a doctor who hadn't seen him . . . Why didn't the state call a witness, one of its many witnesses who had some *knowledge about this man*?

> Counsel: Well, the many witnesses who had, in fact, examined the defendant *testified for the defendant*. . . .

We regard this as a devastating admission. The State's own experts clearly and conclusively establish the defendant's insanity defense, leaving the State in the position of relying upon a single doctor who had not even seen him. The defendant's only burden was to establish a *prima facie* case of insanity. He did so by offering conclusive proof of insanity; the State made no effort to carry its burden.

IV.

*Analysis of Proof of Insanity*

As the Court of Criminal Appeals correctly noted, "the case was properly tried under the *Graham* Rule." In *Graham v. State*, 547 S.W.2d 531 (Tenn.1977), we reviewed the history of the *M'Naghten* tests for insanity. We pointed out that this was a two-pronged test involving (1) knowledge of the nature and quality of the act; and (2) knowledge of its wrongfulness. We reviewed Tennessee cases starting with *Dove v. State*, 50 Tenn. 348 (1871), and pointed out that Tennessee had consistently adhered to the "right and wrong" prong but had never discussed the "nature and quality" portion of the test. This latter portion of the test "calls for something deeper and more vital." 547 S.W.2d at 539.

We adopted the American Law Institute Model Penal Code, Section 4.01 (1962). The test so adopted reads:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to *appreciate the wrongfulness of his conduct* or to *conform his conduct to the requirements of the law*. (Emphasis supplied). 547 S.W.2d at 543.

We recognized in *Graham* that "the phrase 'to appreciate the criminality [wrongfulness] of his conduct' . . . is a substitute for the *M'Naghten* clause 'to know the nature and quality of the act he was doing.' " 547 S.W.2d at 541. Further,

we said, the new test was "essentially a refinement and restatement of the full *M'Naghten* Rules," *id.*, and that "there is not a vast difference between the rule we adopt and the *M'Naghten* Rules *as they should be applied.*" 547 S.W.2d at 543 (Emphasis supplied).

In a word, the *Graham* test was necessitated by a failure of the courts to apply the full *M'Naghten* Rule, concentrating upon "right and wrong" and ignoring "nature and quality." Now we again have two tests, *i. e.*, (1) capacity to appreciate wrongfulness (right and wrong, nature and quality) and (2) capacity to conform one's conduct to the requirement of the law.

It is important to Tennessee criminal jurisprudence that the second prong of the *Graham* test not suffer the same fate as its *M'Naghten* predecessor. There is *scant* proof in this record (only Dr. Beasley on hypothetical and Dr. Siegmann's testimony of "vague reality") that defendant had the capacity to appreciate the wrongfulness of his conduct, but there is not even a suggestion that he had the ability to conform his conduct to the requirements of the law. All proof to this point was *contra.*

Dr. Luton testified that defendant was seriously and chronically mentally sick, that at the time he committed the murder "he was not able to judge the nature of his act" and "not able to conform" his conduct to the requirements of the law.

Dr. Higgs testified that even under the *McNaghten* Rule "he would have had an insanity defense."

Dr. Siegmann testified that defendant could not conform his conduct to the requirements of the law. Dr. Siegmann's comment that a schizophrenic "does not lose all semblance of what he was doing, which means in some ways a vague reality situation is almost always the awareness of a schizophrenic," is both interesting and significant in view of the paltry reasons assigned by the State for a finding of sanity in this case.

Tennessee does not subscribe to the "wild beast" test of insanity, under which the defendant is held responsible unless wholly deprived of understanding and memory so as not to know what he was doing. *See* 21 Am.Jur. *Criminal Law*, Section 33, footnote 13 (1965). But, it is only by the application of this theory that this conviction *possibly* can stand.

The State insists that defendant was acting as a rational human being because:

a. Twice, after the crime, he stated: "I shot me a m_ _ _ _ _ f_ _ _ _ _."

b. Immediately after fleeing the bus terminal and getting into the car, he wanted the radio on to see if any news of the shooting was being broadcast.

c. He looked back to see if the car was being followed.

d. He escaped from the wrecked car.

e. Dr. Beasley, in answer to a hypothetical question, stated he had knowledge of wrongdoing.

Our colleagues of the majority seem to rest their conclusion of sanity on four aspects of the case. First, they say he was aware of what he had done, but we point out that this awareness does not meet the second prong of the *Graham* rule, *i. e.*, the ability to conform his conduct to the requirements of the law.

Next, they say he sought to avoid apprehension and evaded capture for several weeks. The short and simple answer to this is that any fool faced with fear and foreboding can flee and hide. Such is the nature of even a wild beast.

Thirdly, they say that he had only a short history of mental illness. The test is not the duration but the fact of legal insanity.

Lastly, they say he was "highly intelligent." There is no insistence that Stacy is stupid—just that he was insane. We were not aware that insanity is visited only upon the unintelligent or that the intelligent are insulated against insanity. Indeed, there seems to be a rather marked correlation between intelligence and insanity. It was this known fact that prompted J. Dryden's immortal lines, "Great wits are sure to

madness near allied, and thin partitions do their bounds divide." [4]

Conceding, *arguendo*, that these facts—and there are no others—established that defendant knew right from wrong, they do not in any sense suggest that he had the capacity to conform his conduct to the requirements of the law.

Defendant not only made out a *prima facie* case, but an overwhelming one.

The burden then, in accordance with the established law, shifts to the State to "establish the defendant's sanity to the satisfaction of the jury and beyond a reasonable doubt." *Graham v. State, supra.* This was a heavy burden and the State, with a battery of trained and knowledgeable experts at its beck and call, made no effort to carry it.

Rule 13(e), Tenn.R.App.P., requires that findings of guilt be "set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." This is the mandate of *Jackson v. Virginia* 433 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Upholding the conviction of this defendant ignores these controlling standards.

## V.

### The Dilemma of the Courts

### A.

The courts, when sitting in final judgment in cases wherein insanity is established beyond a reasonable doubt, are confronted with wholly untenable alternatives.

On the one hand, compelling consideration of compassion and basic instincts of human decency are revulsed at punishing an individual whose basic and beginning condition is insanity as opposed to criminality. On the other, the preservation and protection of society demand that, irrespective of the unfortunate plight of an insane individual, one whose mental condition precludes his ability to conform his conduct to the demands of society should not be released.

In a very real sense the confinement of the insane is the punishment of the innocent; the release of the insane is the punishment of society.

There are pragmatic reasons that preclude penitentiary confinement. Unto the distressingly overcrowded and understaffed prison system of our state we are committing a trouble-maker, a misfit, a man who simply cannot live in a prison environment. These are the people who foment disorder and who are in a large measure responsible for crime within the walls of our state penitentiary.[5]

There is no acceptable choice under the present condition of our law. To punish the innocent is repugnant to our system of justice; to release the dangerously insane upon society is unthinkable. While we respect the view of others, when faced with this dilemma we are left with no choice but to follow the dictates of the law as we understand it, and the law demands that a criminal conviction of the insane may not stand.

The abolition of the defense of insanity is not a viable alternative. Only two states have tried this approach and in each instance abolition was declared unconstitutional. *Sinclair v. State*, 161 Miss. 142, 132 So. 581 (1931); *State v. Strasburg*, 60 Wash. App. 106, 110 P. 1020 (1910).

It is evident that the abolition of the defense would run afoul of due process in that it would deprive defendants of the traditional right to negate proof of criminal intent. The insanity defense is considered one of the fundamental rights of the citi-

---

4. J. Dryden, Absalom and Achitophel (1680).

5. The testimony of Dr. Higgs is relevant:
Q. . . . . is there danger of serious harm to others in the event of a relapse?
A. There *could* be because he could do something foolish like he did before which caused him to get into this difficulty.
Q. So then, without medication then and proper management, without hospitalization sought, this young man stands in danger of harm to himself and others by relapse?
A. That's correct.
This testimony was given at the hearing, *before* the murder, designed to determine competency to stand trial on another charge.

zen. It originated during fourteenth century England and has been a complete defense against criminal liability since that early period of the common law; it was established in America at the time our federal constitution was drafted. R. Perkins, *Criminal Law* 851 (2nd ed. 1969).

Thus, the defense is deeply entrenched in our law as one of those immutable principles not subject to change, unless it be at the hands of the Supreme Court of the United States.

## B.

A decade or so ago a principle issue facing our courts was the plight of insanity acquittees who were being deprived of their liberty by virtue of being held in mental institutions indefinitely, even though they had been found not guilty of the crime with which they were charged. This deprivation of liberty was addressed and the problem corrected by a trio of cases decided by the Supreme Court. *Jackson v. Indiana*, 406 U.S. 715, 95 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972) and *Baxtrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

Primarily as a result of these cases, automatic commitment and prolonged confinement of those found not guilty of criminal charges by reason of insanity are prohibited. *See generally*, German and Singer, *Punishing the Not Guilty; Hospitalization of Persons Acquitted by Reason of Insanity*, 29 Rutgers L.Rev. 1011, 1025 (1976).

Thus, the Supreme Court mandated that civil and criminal committees be accorded the same rights; that acquittal by reason of insanity requires a pre-commitment, due process hearing; that after commitment periodic examinations must be given at reasonable intervals; and that the committed patient must be released when his mental condition is such that his liberation would not lead to further violations of society's rules and his own good requires no further restraint.

Pragmatic considerations tend to frustrate and embarrass these seemingly sound principles. Chief among these is the recurring problem created by "synthetic" or "chemical" sanity, so called because many patients, by use of carefully regulated medication, administered in the protected and sheltered environment of a mental institution, can be restored to sanity. On his release, a patient so restored may live and function as a normal human being so long— but only so long—as he takes his "pills." A careless or deliberate failure to use his prescribed medication frequently is attended by devastating consequences. Thus, another dilemma: two individuals are afflicted by the same mental ailment; one takes his medication and undergoes any prescribed follow-up care; the other does not. The former is restored to productive citizenship; the latter becomes a menace to society. Must both suffer because one cannot and will not conform? It is simple to recognize the problem and pose the question; the solution is more difficult.

At any rate where the problem at one time was how to get insanity acquittees *out* of an institution, the problem now is how to *keep them in*—how to keep dangerous mentally ill criminals from returning "to the streets" after an all-too-often relatively short stay in a mental institution. While we are in no sense critical of the Supreme Court, we recognize the mammoth problem created by *Jackson v. Indiana, supra.*

## C.

The Tennessee Legislature has made an effort to meet the thrust of *Jackson.* Section 33–709, T.C.A., provides in substance that when a criminal defendant is found not guilty by reason of insanity, the trial judge shall order his detention "for diagnosis and evaluation for a minimum of sixty (60) days and a maximum of ninety (90) days in a hospital or treatment resource."

Following evaluation, and after certification as provided by Section 33–604(a) T.C.A., the District Attorney is required to petition the court for judicial hospitalization. Section 33–604(c) provides for a due process hearing, with the full panoply of

rights. The Court is authorized to commit the defendant if it finds by "clear, unequivocal and convincing evidence:[6]

(1) That the individual is mentally ill and

(2) Because of this illness, poses a likelihood of serious harm . . . and

(3) All available less drastic alternatives to commitment to a mental hospital or treatment resource are unsuitable."[7]

If the defendant does not meet these criteria his immediate release is ordered. Section 33–604(d), T.C.A.

Those knowledgeable in the field of criminal law recognize that the defense of insanity is scorned by prosecuting attorneys, abused by some defense lawyers, viewed with distrust by juries, scrutinized with suspicion by many trial judges and tends to fall apart on the appellate level. And yet all concerned must recognize that a person who is truly insane is entitled to fair treatment in a court of law. A resolution of this problem is a matter of critical concern.

### D.

We are impressed with the attempted Michigan approach to this problem. While a thorough analysis of the Michigan law is beyond the purview of this dissent, we do feel the need to explore the mechanics of this 1975 enactment.

Michigan law (Mich.Comp.Laws Ann. 768.36) provides for a verdict of guilty but mentally ill. This is an alternative to the conventional verdict of not guilty by reason of insanity. A finding of guilty but mentally ill is permitted in the case of any defendant who asserts a plea of insanity if the trier of fact finds beyond a reasonable doubt:

(a) That the defendant is guilty of an offense.

(b) That the defendant was mentally ill at the time of the commission of that offense.

(c) That the defendant was not legally insane at the time of the commission of that offense.

It should be noted that the Michigan test of criminal responsibility is similar to the *Graham* rule. A finding of insanity is a complete defense. "Mental illness" is defined to be:

. . . substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. M.C.L.A. Sec. 330.1400a, M.S.A. Sec. 14.800(400a).

This definition falls short of legal insanity. A finding of guilty but mentally ill negates insanity and, therefore, would not destroy the existence of *mens rea*. The defendant, while mentally ill, was not insane and had the mental ability to entertain the requisite criminal intent.

This procedure goes a long way in the direction of solving the dilemma we have discussed. Instead of Tennessee's all-or-nothing approach under which the insane may be confined in the penitentiary or "turned loose on the streets," Michigan juries have a means, in proper cases, to assure the protection of society and simultaneously to provide treatment.

As the Michigan Supreme Court phrased it in *People v. McLeod*, 407 Mich. 632, 288 N.W.2d 909 (1980):

Guilty but mentally ill defendants are in a wholly different position than defendants found not guilty by reason of insanity. The former have been found beyond a reasonable doubt to have been 1) guilty of an offense, 2) mentally ill at the time of the commission of the offense, and 3) not legally insane at the time of the offense.

They no longer have a right to unfettered liberty. They have been convicted of a crime. 288 N.W.2d at 917.

---

**6.** It should be borne in mind that a finding of not guilty by reason of insanity does not establish the legal status of insanity; *its* only effect is an adjudication that the State could not establish sanity beyond a reasonable doubt, or

phrasing it differently, his mental condition enabled him to negate intent.

**7.** This record shows beyond peradventure of doubt that Stacy meets all criteria.

Under the Michigan procedure, upon a finding of guilty but mentally ill, sentence is imposed without regard to the defendant's mental condition, *i. e.*, just as if he were mentally sound. Upon commitment to the department of corrections he is evaluated and given psychiatric treatment, which may be provided by corrections or the department of mental health pursuant to transfer. Provision is made for his return, on cure or remission, to corrections to serve out the balance of his sentence. Thus, he is not released "on the street." As noted in Amarilio, *Insanity—Guilty But Mentally Ill—Diminished Capacity: An Aggregate Approach to Madness*, 12 J.Mar.L.Rev. 351, 369 (1979):

> This in effect creates a revolving door policy. But rather than having the door revolve from a mental facility into the street, it revolves from one secured facility to another, thereby assuring public protection.

Provision is made for parole and for probation.

The Michigan approach perhaps is not ideal. Admittedly the distinction between insanity and mental illness is technical and tedious. It could become confusing to juries; however, this problem could be solved to a large extent by a jury finding of guilt or innocence, with sentencing by the trial judge who could apply medical and lay proof and make the determination.

It is also true that juries—and perhaps judges—and maybe appellate courts—could abuse this law. This, however, can happen under the present system—with far more serious consequences.[8] It is far better that an occasional insane defendant be found to be mentally ill and sentenced than to have the vast majority of insane defendants found guilty and sentenced to the penitentiary to suffer in the darkness of their unenviable plight and abandon hope for the possibility of cure while all potential good

in them wastes and withers in the prison air.

The Michigan statute has been held constitutional in the face of an attack hinged upon the allegedly indistinguishable definitions of mental illness and insanity. *People v. Sorna*, 88 Mich.App. 351, 276 N.W.2d 892 (1979).

The guilty but mentally ill verdict has survived other constitutional onslaughts. *See People v. McLeod*, 407 Mich. 632, 288 N.W.2d 909 (1980); *People v. Darwall*, 82 Mich.App. 652, 267 N.W.2d 472 (1978); *People v. Jackson*, 80 Mich.App. 244, 263 N.W.2d 44 (1978).

## VI.

### Conclusion

We have written at length about the facts motivated by a deep conviction that an insane man is being consigned to the life of a convict because he is insane. All else is secondary.

We have written at length about the problem because we believe it cries out for consideration and solution. To contend for a better brand of justice for insane defendants is an inescapable obligation of the Bench and Bar of this state.

To provide a more humane and realistic law is an inescapable obligation of the Legislature.

It has now been almost three decades since the late Governor Frank G. Clement crusaded for more humane treatment of the mentally ill, characterizing them as "the least among us" and bemoaning the fact that most people like to "give in the sunlight and receive in the dark" and that our state mental patients had no one to lobby for programs of improvement. Under the guiding influence of this "humane" governor, Tennessee made outstanding progress in the care and treatment of the mentally ill. But the law of insanity, an unpalatable

---

**8.** Technically speaking, the Michigan plan of guilty but mentally ill would have availed Stacy naught because he was not mentally ill, but plainly insane and incapable of criminal intent. However, had there been available a middle ground of a finding of guilty but mentally ill, we cannot believe that the jury, the trial judge, or either appellate court would have found sanity.

and unsavory aspect of the law, in practical application is archaic, antiquated and inhuman.

We voice the hope that the forthcoming General Assembly will appoint a distinguished, knowledgeable and objective commission charged with the responsibility of making an in-depth survey of the defense of insanity to the end that it may formulate rules designed to balance the rights of insane defendants against the interest of the public.

In the meantime, because of the conscientious and deeply held conviction that William Earl Stacy was insane at the time of the commission of murder, we would follow the mandate of the law and dismiss this prosecution, leaving it to the District Attorney General to seek hospitalization, and voicing the hope that Stacy would be retained until such time as his release will not pose a danger to the public.

FONES, J., concurs.