**William Earl STACY, Petitioner-Appellee,**

v.

**Aileen LOVE, Warden; William Leech, Attorney General of the State of Tennessee, Respondent-Appellant.**

**No. 81–5312.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1982.

Decided June 3, 1982.

William M. Leech, Jr., Atty. Gen. of Tennessee, Nashville, Tenn., Robert L. Jolley, Jr., Asst. Atty. Gen., for respondent-appellant.

Walter C. Kurtz, Public Defender, Nashville, Tenn. (court-appointed), for petitioner-appellee.

Before MARTIN, Circuit Judge, WEICK, Senior Circuit Judge, and HILLMAN,* District Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

The State of Tennessee appeals an order of the United States District Court for Middle Tennessee, granting Stacy's writ of habeas corpus pursuant to 28 U.S.C. § 2254. In February of 1978, Stacy was convicted of first degree murder and sentenced to life imprisonment by a Knox County, Tennessee jury. After an unsuccessful appeal to the Court of Criminal Appeals of Tennessee, Stacy petitioned for and was granted a writ of certiorari by the Tennessee Supreme Court which also affirmed his conviction, over a vigorous dissent, in a decision reported as *State v. Stacy*, 601 S.W.2d 696 (Tenn. 1980). After exhausting all his state remedies, Stacy filed this petition alleging *inter alia*, that his conviction was unconstitutional because it was not supported by sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). More specifically he argued, and the District Court agreed, that the state had failed to produce sufficient evidence from which any rational trier of fact could conclude, beyond a reasonable doubt, that Stacy was sane when he shot his victim, a Greyhound Bus Lines ticket teller.

The relevant facts of this case are simple. Stacy is a chronic schizophrenic. The defense presented overwhelming evidence to that effect. Prior to the shooting, Stacy had twice been hospitalized for significant periods of time. He was so mentally ill that upon entering these institutions he

---

* Honorable Douglas W. Hillman, United States District Judge for the Western District of Michigan, sitting by designation.

could not meaningfully participate in psychological testing. Stacy hallucinated, saw ghosts, and in general could not act in a socially acceptable manner. While hospitalized he would sometimes wander the hallways all night talking to himself. Acquaintances testified to his blank stare, continual nervousness, and inappropriate laughter. At trial, psychiatrists described schizophrenia as an inability to remain in contact with reality and the record evidence depicts Stacy displaying that symptom at every turn. Yet his condition could be, and effectively was, controlled with drugs. If kept in a controlled environment and properly medicated, Stacy was able to contribute to the hospital work force. Without the drugs however, his condition, as one psychiatrist testified, would immediately begin to disintegrate.

Stacy's first hospitalization occurred near the end of a prison term he was serving in August 1974. The authorities feared that Stacy, then in the psychotic ward, would be dangerous to himself and others if returned to society, and arranged for his transfer to Central Tennessee State Hospital. At Central State, he was diagnosed as schizophrenic and remained under voluntary commitment until October 1974.

Stacy returned to Central State in March 1975 pursuant to a court order following his arrest for burglary. After undergoing treatment, he was brought to the Knox County Criminal Court on July 8, 1975, where Judge Ford found him incompetent to stand trial and ordered him committed to Eastern State Hospital for an indefinite period. Judge Ford would later testify at Stacy's murder trial that he believed Stacy was seriously mentally ill at the time.

Stacy entered Eastern State immediately but was, inexplicably, released after a brief stay on July 23, 1975, seven days prior to the murder. The Knox County court was neither notified nor asked to authorize his release even though Stacy, as a criminal defendant, was at that time a ward of the state. Worse, Stacy was released without his medication and without the normal aftercare appointment. His sister, Kathy, testified that upon discharge his condition was so badly deteriorated that, fearing he might have escaped, she called the hospital to confirm that he had in fact been discharged.

Stacy spent the next seven days at his sister's home. She testified that his behavior during this period was quite strange. He was nervous, seemed to be in his own world, and would laugh and giggle for no apparent reason. At night, he saw ghosts and tried to convince her that they inhabited the house. Occasionally he would wander around the house nude in front of her, her children, and neighbors. She came upon him one evening holding an empty revolver to her son's head, threatening to blow his brains out.

On the morning of July 30, 1975, Stacy met up with an old acquaintance, Carlton Swift, and a new one, Ira Minifee. They spent the day together riding around in Swift's car. Minifee later testified to Stacy's unusual and inappropriate behavior during the course of the day. At approximately nine o'clock that evening, Swift pulled up to the Greyhound Bus terminal in Knoxville stating that he wanted to go inside to use the restroom and purchase some cigarettes. Stacy accompanied him. Shortly after they entered, a Greyhound ticket teller was fatally shot once in the throat, apparently in the course of a robbery attempt. Although no one actually witnessed the shooting, bus patrons testified to seeing Swift and Stacy flee the scene. Upon returning to the car, Stacy told Minifee that he had just shot someone, a statement he would subsequently repeat to others. Later that evening, Swift and Minifee were arrested after an automobile chase. Stacy, who was in Swift's car, managed to escape and was not apprehended until several weeks later at which time he was jailed and then rehospitalized.

At trial, Stacy pled not guilty by reason of insanity. The defense presented four expert and several lay witnesses who detailed the depth of Stacy's mental illness. Typical of the expert testimony was that of Dr. Luton. The late, former Justice Joe

Henry of the Tennessee Supreme Court accurately summarized Dr. Luton's contribution in his eloquent dissenting opinion:

> The defendant called Dr. Frank L. Luton, the Assistant Superintendent for Clinical Psychiatric Services at the Middle Tennessee Health Institute. Dr. Luton has practiced psychiatry for forty-eight years. His career has been remarkable. His background includes graduation from the Medical School at Vanderbilt, four years of postgraduate training at Johns Hopkins, training in London, further training in Boston and as a teacher of psychiatry at Vanderbilt. He has been professer emeritus at Vanderbilt since 1963. We consider his testimony to be significant and conclusive.
>
> Dr. Luton was thoroughly familiar with all records pertaining to defendant and had interviewed and evaluated him on numerous occasions. He diagnosed his condition as "schizophrenic, *chronic* undifferentiated type."
>
> \* \* \* \* \* \*
>
> Dr. Luton's testimony sheds substantial light on the medication question. He testified that "[w]hen he's not medicated, he becomes grossly psychotic, grossly ill, mentally ill." He testified that with medication defendant "behaves in a relatively normal fashion," but that he cannot be trusted to take his medication— "[h]e gets the idea that he doesn't need it any longer."
>
> Basing his testimony on his own examinations he voiced the opinion that at the time of the murder defendant "was mentally sick, seriously, at that time." He testified that his condition was "chronic" and that it "goes back to the time when he committed the act and [that] at that time he was *not able to judge the nature of his act.*" (Emphasis supplied). Further, he was "not able to conform" his conduct to the requirements of the law. It is evident from Dr. Luton's testimony that defendant is dangerously psychotic when off his medication and yet he was released from the East Tennessee Mental Health Institute (Eastern State Hospital)

without medication. As Dr. Luton phrased it, "the minute he quits taking his medicine, he's losing ground."

*State v. Stacy, supra,* 601 S.W.2d at 700.

In rebuttal, the state called a single witness, Dr. Beasley. Beasley, who was not personally familiar with Stacy's problem, could only respond to what Justice Henry aptly characterized as a "rambling, court-supplemented, lawyer-amended hypothetical question of questionable competence." *Id.* at 702. Dr. Beasley stated that in his opinion the hypothetical individual, meaning Stacy, could appreciate the wrongfulness of his conduct. All remaining portions of his testimony were, as Justice Henry noted, properly stricken by the trial judge. *Id.* As a result, the case was submitted to the jury with no evidence of Stacy's ability to conform his conduct to the requirements of the law, which together with the awareness of right and wrong constitutes Tennessee's test of insanity. It was on the basis of this failure of proof that the District Court, in an exhaustive opinion published at 528 F.Supp. 38 (M.D.Tenn.1981), granted Stacy's petition.

We are deeply troubled by the implications of this case. Like the court below, we are acutely aware that overturning Stacy's conviction for insufficient evidence operates as an acquittal and thereby calls into effect the constitutional proscription against double jeopardy. *United States v. Burks,* 437 U.S. 1, 17–18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). Thus, granting this petition not only frees William Stacy but bars his retrial as well. This is an alarming result, for we entertain no doubt that Stacy, if left in an uncontrolled environment and without benefit of medication, remains a source of potential danger to his fellow citizens.

It is nevertheless our duty to enforce the rights Stacy enjoys under the Constitution. Due process requires the state to prove, beyond a reasonable doubt, every element of the offense charged. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Where, as here, a defendant challenges the sufficiency of the state's evidence, we must ask:

Whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (court's emphasis).

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We consider that our review is further refined by *Fuller v. Anderson*, 662 F.2d 420 (6th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1734, 72 L.Ed.2d 150 (1982), which cautions that, as Justice Stevens pointed out in his response to the denial of certiorari, we must "review the evidence in the light most favorable to the prosecution." 662 F.2d at 423. We have examined the record below with great care and can only conclude that the District Court was correct in holding that the state failed to sustain this burden.

■ Under Tennessee law, a criminal defendant who relies on the insanity defense must first present a *prima facie* case of mental illness. If he succeeds the usual presumption of sanity dissolves and the burden shifts to the state to prove, beyond a reasonable doubt, that the defendant was sane. *Graham v. State*, 547 S.W.2d 531, 544 (Tenn.1977). Thus, under these circumstances, sanity becomes an element of the crime. We note that the Constitution does *not compel* a state to adopt this burden shifting principle on the issue of criminal capacity. The burden of proving insanity *could* constitutionally remain at all times on the defendant. *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). Having embraced this rule, however, the State of Tennessee is obligated to follow it. It did not do so in Stacy's case.

*Graham, supra*, offers the following definition of insanity:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct *or* to conform his conduct to the requirement of the law.

(2) As used in this Article, the terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

547 S.W.2d at 543 (emphasis added).

■ Thus, to prove sanity, the prosecution must disprove both parts of the *Graham* insanity test. That is, it must show that the defendant could appreciate the wrongfulness of his conduct *and* had the capacity to conform his conduct to the requirements of the law.

As we noted in our summary of the facts, the state presented expert testimony on the first portion of the test, the old *McNaghten*[1] "right and wrong" principle. No testimony, lay or expert, was offered to prove the second portion: Stacy's ability to conform his conduct to the requirements of the law. The prosecution simply failed to present any evidence whatsoever on this point. The state's rebuttal to the defense's very substantial *prima facie* case consisted entirely of Dr. Beasley's answer to a hypothetical question based on the *McNaghten* inquiry.

In upholding Stacy's conviction, the Tennessee Supreme Court pointed to certain evidence and held that the jury could have inferred the answer to the second, unaddressed part of the Graham test from these facts alone. The majority opinion characterized the murder and attempted robbery as "planned and deliberate." *State v. Stacy, supra*, 601 S.W.2d 696, 697. It stressed that after shooting his "intended" victim, Stacy recognized what he had done, fled, and evaded police for several weeks. *Id.* Furthermore, the majority attempted to cast doubt on the role played by Stacy's medication when they noted that he was off it "for only a short period of time, if at all." *Id.* Finally, the court concluded that his conduct at or about the time of the murder "does not even compare remotely with the conduct described when he was totally psychotic or out of touch with reality." *Id.*

1. *M'Naughten's Case*, 8 Eng.Rep. 718 (H.L. 1943).

We simply cannot accept any of these observations as a basis for upholding Stacy's conviction. In the first place, there was no evidence whatsoever that Stacy "planned" to rob the Greyhound station. No money was in fact taken and the robbery charge was dismissed at trial. Minifee testified only that Swift pulled up to the station, announced that he was going inside to buy some cigarettes and use the bathroom, and that Stacy accompanied him. While those "plans" certainly changed at some juncture, the point is that there was no evidence of "planning" on Stacy's part from which a jury might have inferred that Stacy possessed the requisite mental capacity.

Second, with respect to Stacy's flight from the scene of the crime, we must agree with Justice Henry's comment:

> The short and simple answer to this is that any fool faced with fear and foreboding can flee and hide. Such is the nature of even a wild beast.
>
>     . . . .
>
> [But] Tennessee does not subscribe to the "wild beast" test of insanity, under which the defendant is held responsible unless wholly deprived of understanding and memory so as not to know what he was doing.

*State v. Stacy*, 601 S.W.2d at 703.

Third, Minifee, Kathy Stacy, and Regina Mack, who, like Minifee, was a witness for the prosecution, testified at length to Stacy's inappropriate and abnormal behavior during the seven days between his release from Eastern State Hospital and the shooting. Much of this testimony pertained to unusual behavior on the very day of the shooting. Moreover, the man who shared Stacy's cell after his arrest recounted Stacy's delusion that he was a member of the President's Cabinet and described his habit of standing naked in the cell with toilet paper stuffed in his nostrils. With a concision and clarity rarely associated with the interface of law and psychiatry, the cellmate described Stacy's condition shortly after his arrest: "he ain't got good sense, he's crazy."

Fourth, the state offered no evidence of Stacy possessing or taking his medication during the interim between his release and the shooting. Instead, the unrebutted evidence showed that he left Eastern State with no medication and no prescription. Not one witness who had contact with Stacy for more than a brief period testified to normal behavior on his part outside an institution. Stacy had failed in school. There was no evidence of his ever holding an outside job. Almost all his young adult life appears to have been spent in some form of public institution. Only when Stacy was hospitalized and medicated were witnesses able to say that he conducted himself in a socially acceptable manner.

■ In summary, the record is simply devoid of any evidence that Stacy had the ability to conform his conduct to the requirements of the law. Where, as here, the state bears the burden of proving the defendant sane beyond a reasonable doubt and fails to present any evidence which addresses an essential element of the legal test of insanity, a conviction is repugnant to due process and must be reversed.

Accordingly, we hold that the District Court properly granted petitioner's writ. Our ruling today means that William Stacy must be released from prison and may not be retried. *See United States v. Burks*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We can only hope that the state will exercise its power to commit this man to a psychiatric hospital until he displays the ability to live peacefully in our society.

Judgment affirmed.

DOUGLAS W. HILLMAN, District Judge, concurring:

This court today affirms an order of the United States District Court for the Middle District of Tennessee granting Stacy's writ of habeas corpus, pursuant to 28 U.S.C. § 2254. In his dissent, Senior Circuit Judge Weick, quoting Chief Justice Burger, implies that the majority has either ignored or forgotten that it is for the jury, not the judge, to make factual findings. In addi-

tion, Judge Weick has produced a scoreboard, listing those individuals, presumably found by the decision of this court to have acted irrationally in having found Stacy able to conform his conduct to the requirements of the law. Specifically, Judge Weick says:

"In other words the 12 jurors were not rational, the trial judge who entered judgment on the guilty verdict was not rational, the three judges on the Court of Criminal Appeals were not rational, and the three Justices on the Supreme Court of Tennessee were not rational. The result is that only the two dissenters on the Supreme Court of Tennessee and the district judge were rational."

These allegations warrant a response.

It is axiomatic that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

Here, Stacy relied upon the defense of lack of mental capacity. Under Tennessee law, having made out a prima facie case of lacking the requisite mental capacity, he could not be convicted except upon proof beyond a reasonable doubt that he was sane at the time of the crime. *Graham v. State*, 547 S.W.2d 531 (Tenn.1977). Petitioner was convicted of murder in the first degree. In his habeas petition, Stacy is confronted with two legal hurdles: First, the language of section 2254(d) itself provides that a factual determination by a state court shall be presumed to be correct unless "(8) ... the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record." Secondly, his petition will be denied if the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. Or, in the language of *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979), "... the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no

rational trier of fact could have found proof of guilt beyond a reasonable doubt." Also, of course, the evidence must be viewed in the light most favorable to the prosecution. The difficulty arises in the application of the rule.

In this case, as pointed out by Judge Weick, a jury of 12 unanimously found Stacy sane "beyond a reasonable doubt" and that finding was affirmed both by the Tennessee Court of Criminal Appeals and a divided (3–2) Tennessee Supreme Court. Do those facts, as Judge Weick implies, conclude the matter? How does a federal judge determine whether an individual or a group of individuals have acted rationally?

The problem facing the federal courts is highlighted by *Fuller v. Anderson*, 662 F.2d 420 (6th Cir. 1981), *cert. denied* —— U.S. ——, 102 S.Ct. 1734, 72 L.Ed.2d 150 (1982), where an experienced and distinguished Chief U. S. District Judge concluded that insufficient evidence existed in the record to conclude petitioner had intended to commit a crime. Specifically, in that case, it was his considered judgment that no rational juror could find from the record the requisite intent required in a charge of first degree murder. A majority of this Court agreed, Judge Weick dissenting. Yet on the same identical record, in a dissent to the denial of certiorari, the Chief Justice of the United States said: "It is sheer nonsense to suggest that, on this record, the 12 jurors acted irrationally."

Although trial by jury is the linchpin of our judicial system, nevertheless no system is infallible. As Justice Stewart said in *Jackson, supra,* "A properly instructed jury may occasionally convict when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." All trial lawyers, as well as judges, know that on occasion and with no logical explanation, juries occasionally go haywire. Undoubtedly, such factors as the nature of the crime, a fear or hatred of the accused, pre-trial publicity, outstanding advocacy, public uproar, and notoriety of the parties could, and on occasion do, produce such results. To conclude categorically that because of a unani-

mous verdict a jury has acted rationally seems to me to fly in the face of understandable human passions and frailties.

*Jackson* requires more than a tally sheet. It mandates an independent review of the evidence to determine whether the evidence reasonably supports a finding of guilty beyond a reasonable doubt. No two cases are alike. Presumably, each case must be decided on its own facts. After a careful reading of the entire record in this case, I am simply unable to say that the jury was warranted, on the evidence before it, in failing to entertain a reasonable doubt that, except for a diseased mental condition, Stacy would have killed the ticket clerk.

Judge Martin, writing for the court, has detailed the evidence surrounding Stacy's mental condition at the time of the killing. Giving the Government the benefit of all legitimate inferences to be drawn from the record evidence of Stacy's mental condition, it was at best meager and inconclusive. Stacy not only made a prima facie case, but an overwhelming one. As a matter of law, the evidence produced by the State with respect to Stacy's mental condition was not enough to rebut Stacy's evidence and did not meet the Government's high burden.

Despite recent pleas [1] that increased deference be given to the decisions of the state court system, we are reminded by Professor Yale Kamisar, *Constitutional Law Deskbook* (1978) (published by the National College of District Attorneys), that Justice Harlan repeatedly warned that the striving for "compelled uniformity" between the State and federal criminal justice systems is not only "inconsistent with the purpose of our federal system," but that a consequence might well be a "dilution in federal law enforcement of the specific protections found in the Bill of Rights." *See, e.g.,* his dissent in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1969).

In reviewing habeas claims, we must constantly be vigilant so that constitutional values are not jeopardized in any way, and it is that vigilance which today leads me to concur in the majority opinion.

WEICK, Senior Circuit Judge, dissenting:

I respectfully dissent. This appeal presents the spectacle of a single district judge, in a habeas corpus proceeding, granting the writ and overturning the judgment of conviction in the Criminal Court of Knox County, Tennessee, entered by the judge upon a unanimous verdict of guilty of twelve jurors of murder in the first degree in the perpetration of robbery, which judgment was affirmed by the Court of Criminal Appeals of Tennessee and by a divided Supreme Court of Tennessee.

The robbery was perpetrated by Stacy and two confederates. Stacy, who had a criminal record, did the shooting and his defense was insanity. Stacy had sense enough to flee after the robbery and shooting and was not apprehended until sometime later. The confederates did not claim to be insane. The facts are set forth in the opinion of the Court of Criminal Appeals and the majority opinion of the Supreme Court of Tennessee and they are binding on the federal courts in habeas proceedings.

The district court also detailed the facts in a 51 page opinion in which it acted as an appellate judge reviewing as upon direct appeal. It had no appellate jurisdiction as a habeas petition constitutes a collateral attack upon the judgment of conviction. The district judge did rely on *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and closed with the statement that no rational trier of facts could have found proof of guilt beyond a reasonable doubt. In other words, the twelve jurors were not rational, the trial judge who entered judgment on the guilty verdict was not rational, the three judges on the Court of Criminal Appeals were not rational, and the three Justices on the Supreme Court of Tennessee were not rational. The result is that only the two dissenters on the Supreme Court of Tennessee and the district judge were rational.

It was not disputed at the criminal trial that a jury issue was presented. Stacy did

---

1.  See, e.g., Michael, *The "New" Federalism and the Burger Court's Deference to the States in* *Federal Habeas Proceedings,* 64 Iowa L.Rev. 233 (1979).

have mental problems, but they were controllable by medication and he then acted normally. He also had been admitted at different times to three mental institutions, but was last released from the F. S. D. unit of the maximum psychiatric unit at Middle Tennessee State because he was no longer in need of high security. He was described in hospital records as being "one of our best patients" who got along well with the staff, had a very pleasant attitude and was a model.

Reliance upon our decision by a divided court in the Michigan habeas corpus case of *Fuller v. Anderson,* 662 F.2d 420 (6th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1734, 72 L.Ed.2d 150 (1982) is misplaced. The fact that the Supreme Court denied certiorari in *Fuller* does not mean that the Supreme Court approved our decision. Justice Stevens in his response to the denial of certiorari stated his belief "that *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 was decided incorrectly." —— U.S. ——, 102 S.Ct. 1734, 72 L.Ed.2d 150.

It is noteworthy that Chief Justice Burger, joined by Associate Justice O'Connor, dissented from the denial of certiorari. Chief Justice Burger stated, *inter alia*:

The District Court and the Court of Appeals incorrectly applied Jackson. There we held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789. It is sheer nonsense to suggest that, on this record, the 12 jurors acted irrationally. With all respect, I suggest that the District Court and the Court of Appeals' majority forgot that it is the function of the jury to determine who is telling the truth. Judges betray their function when they arrogate themselves over the legal factfinder. Either we accept the jury system with the risk of human fallibility or we ought to change the structure of the system and redefine the standard of review under the habeas corpus statutes. The District Court and the Court of Appeals did not view the evidence in the light most favorable to the prosecution, as the law and their oaths require. If they had, they could not have rationally concluded that the jury could not reasonably reach the result it reached. Instead, the courts reweighed Coleman's testimony, noting that he was young, that he had been placed in a youth house because he ran away from home, and that he attended a "special school." Put simply—and bluntly, as this case demands—the federal judges who set aside this state court judgment acted like jurors, not jurists.

This Court cannot sit as a court of errors to correct every mistake by other courts. But the decision here warrants consideration by this Court because the courts have misapplied Jackson in a way that threatens to lead to reversals of state court criminal convictions whenever a federal court chooses to sit as a jury and set aside the lawful jury's findings of fact. There was a flagrant refusal here to review the evidence in the light most favorable to the prosecution, as the law commands. Jackson did not authorize such gross interference with the functioning of state criminal justice systems.

I would grant certiorari and reverse the decision below, with appropriate reminders to our colleagues as to certain fundamental propositions concerning their role. Our heavy docket is an insufficient reason to allow this erroneous judgment to stand. —— U.S. ——, ——, 102 S.Ct. 1734, 72 L.Ed.2d 150.

In my opinion, Chief Justice Burger has correctly stated the law and we should follow his decision. We should also follow the decision of the Supreme Court of the United States in *Bergman v. Burton,* —— U.S. —— ·, 102 S.Ct. 2026, 72 L.Ed.2d 478, which decision summarily vacated our opinion in *Bergman v. Burton,* 649 F.2d 428 (6th Cir. 1981) and remanded to us for further consideration in light of *Rose v. Lundy,* 455 U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).