William Earl STACY

v.

Aileen LOVE, et al.

No. 80–3461–NA–CV.

United States District Court, M. D. Tennessee, Nashville Division.

March 31, 1981.

Walter Kurtz, Metro Public Defender, Nashville, Tenn., for petitioner.

William Leech, Atty. Gen., Nashville, Tenn., for the State of Tenn.

Robert Jolley, Jr., Nashville, Tenn., for respondent.

## MEMORANDUM

MORTON, Chief Judge.

Oral argument in this case was heard on March 18, 1981.

The petitioner was sentenced to life imprisonment following his conviction for first degree murder in connection with a slaying in a Knoxville bus station in 1975. His conviction was affirmed by the Court of Criminal Appeals. A divided Tennessee Supreme Court affirmed the court of appeals in a three-to-two decision. The late Justice Joseph W. Henry, in his last opinion, penned a ringing dissent in response to the brief majority opinion. The matter is now before the district court as a petition for habeas corpus pursuant to 28 U.S.C. § 2254.

The petitioner asserts three grounds for relief. First, he claims that the state failed to prove the petitioner's sanity at the time of the offense beyond a reasonable doubt after his sanity had been brought into question. Secondly, he asserts that evidence of murder in the first degree was not sustained because premeditation was not proved beyond a reasonable doubt. Lastly, the petitioner complains of the admission over objection of hearsay statements allegedly made by a co-defendant who was not on trial and who did not testify.

The testimony will be reviewed in detail.

## BACKGROUND

Petitioner is a young man who has been in and out of mental institutions since 1974. The following are the relevant dates of the petitioner's admissions at mental institutions and the events of this cause.[1]

November 9, 1971—Petitioner sentenced to 3–5 years for burglary and shoplifting.

August 13, 1974—First admitted to Forensic Services Division, Central State Hospital, from the State Penitentiary.

October 18, 1974—Transferred to Eastern State Hospital.

October 23, 1974—Discharged from Eastern State Psychiatric Hospital.

March 5, 1975—Second admission to Forensic Services Division, Central State Hospital, from Knox County Criminal Court.

July 1, 1975—Sent from Forensic Services Division to Knox County Jail for court hearing.

July 8, 1975—Incompetency and Commitment Hearing before Judge Richard R. Ford; represented by Mr. Kim Tollison.

July 10, 1975—Pursuant to T.C.A. §§ 33–708, 33–604, admitted to Eastern State Hospital for indefinite period.

July 23, 1975—Discharged from Eastern State.

July 30, 1975—Shooting at Greyhound Bus Terminal.

August 1975—Petitioner arrested in Nashville, Tennessee.

February 17, 1976—Judge Ford ordered petitioner returned to the Forensic Services Division, Central State Hospital.

March 9, 1976—Petitioner returned to Forensic Services Division for third time.

Sept. 30, 1976—Held at Eastern State Hospital temporarily awaiting court hearing.

October 18, 1976—Petitioner returned to Forensic Services Division by Judge Joseph J. Nigro pursuant to TCA §§ 33–708, 33–604.

August 4, 1977—Petitioner found competent to stand trial by Court of Criminal Appeals. *State of Tennessee v. Stacy,* 556 S.W.2d 552 (1977).

October 11, 1977—Petition for Certiorari denied by Tennessee Supreme Court.

December 18, 1977—Petitioner sent from Forensic Services Division to Knox County Jail to await trial.

The petitioner was first admitted to Central State Hospital on August 13, 1974. He had become psychotic in the penitentiary and was on the psychiatric ward at the Tennessee State Prison before he was ad-

---

1. These dates were received from the testimony of Mr. John Gerdes, Director of the Forensic Services Division, Central State Hospital.

mitted to the Forensic Services Division (hereinafter referred to as F.S.D.). There he was given major tranquilizing medication. Shortly after he was admitted to F.S.D., the Department of Corrections notified F.S.D. that petitioner was eligible for mandatory release. On August 21, 1974, eleven days after he was admitted, Mr. Stacy signed a voluntary admission to Eastern State Hospital. During the petitioner's first admission to F.S.D., he was diagnosed as mentally ill, schizophrenic.

Petitioner was transferred to Eastern State on October 18, 1974. He was released from that hospital on October 23, 1974.

Petitioner returned to Central State, F.S.D., for the second time on March 5, 1975. He had been sent pursuant to court order. The petitioner remained at Central State until July 1, 1975. While at F.S.D., Mr. John Gerdes, a psychological examiner, attempted to test petitioner. The attempt was unsuccessful because the petitioner was too ill to test. He was again diagnosed as schizophrenic and given tranquilizing medication. As a result of this medication, the petitioner's condition improved symptomatically, and he was returned "to court as not competent [to stand trial], judicially committable but not in need of maximum security."

On July 8, 1975, a hearing was held in Knox County Criminal Court, Division II, Judge Richard R. Ford presiding. The petitioner had a pending burglary charge before the court. (This charge had nothing to do with the present cause.) He was represented by Mr. Kim Tollison. During that hearing Dr. Cyrus Higgs, then Assistant Superintendent for Forensic Services, testified. Dr. Higgs had examined and tested petitioner during his second admission to F.S.D. (March 5, 1975—July 1, 1975). He found the petitioner to be schizophrenic. It was imperative that petitioner continue taking his medication because he could suffer a relapse if he ceased taking it. On July 8, 1975, Judge Ford found the petitioner to be incompetent pursuant to T.C.A. §§ 33–708 and 33–604 and judicially committable for an indefinite period. He con-

sidered the petitioner to be seriously mentally ill. Pursuant to the court's findings, Mr. Stacy was sent to Eastern State Psychiatric Hospital on July 10, 1975, for an indefinite period.

Petitioner remained at Eastern State until, surprisingly, he was discharged on July 23, 1975. The court was not notified, nor did the court authorize the petitioner's release. He was released without medication or prescription for medication. No aftercare appointment was made at a mental health center although such an appointment is apparently standard practice when a patient leaves the hospital.

A shooting occurred at the Greyhound Bus Terminal, Knoxville, on July 30, 1975. Mr. George Ault, an employee of Greyhound, died as a result of the shooting. Petitioner was arrested in Nashville for murder in August and returned to Knoxville.

On February 17, 1976, an additional order was issued by Judge Ford. Pursuant to that order, the petitioner was returned to F.S.D. since the shooting obviously had shown that Mr. Stacy was dangerous to himself and others.

Petitioner was admitted to Central State Psychiatric Hospital, F.S.D., for the third time on March 9, 1976, almost eight months after the murder in the bus station. His condition was much like it had been in March of 1975, and he was not amenable to psychological testing at that time. Petitioner was having a chronic episode and was mentally ill, schizophrenic. He was found to be acutely psychotic in April 1976. The petitioner was given tranquilizing medication, and on September 3, 1976, the F.S.D. staff felt that he was competent to stand trial.

On September 30, 1976, petitioner had a hearing in Knox County Criminal Court, Division I, Judge Joseph J. Nigro presiding. At that hearing, the court found petitioner incompetent, and he was returned to F.S.D. on October 18, 1976. The State appealed.

On August 4, 1977, the Tennessee Court of Criminal Appeals reversed the finding of

the trial court and found petitioner competent to stand trial. *State v. William Earl Stacy*, 556 S.W.2d 552 (Ct.Crim.App.1977).

The Tennessee Supreme Court denied certiorari on October 11, 1977. Subsequently, petitioner was transferred from F.S.D. to the Knox County Jail to stand trial for the murder of George Ault.

### THE EIGHT DAYS PRIOR TO THE CRIME

Petitioner was discharged from Eastern State Hospital on July 23, 1975. Kathy Stacy, his sister, picked him up at the hospital and petitioner lived at her home at 208, Court A, College Homes, Knoxville, until the shooting at the Greyhound Bus Terminal on July 30, 1975. He was not taking any medication during this period.

On July 30, 1975, Carlton Swift and petitioner saw Ira Minifee in Montgomery Village, Knoxville. Mr. Minifee was standing in front of Martha Mack's apartment. Minifee had known Carlton Swift for approximately one and a half years and was a good friend of Mr. Swift. He had known the petitioner for three or four days. Mr. Swift, a stout, muscular man training to box, was wearing dress pants and an athletic shirt. Petitioner, taller but not as muscular as Carlton Swift, was wearing blue jeans, a shirt and a knit hat. Minifee was on his way to work when he met Swift and the petitioner. They walked to a car lot and looked at a used car because Mr. Swift was interested in purchasing a car. After looking at some cars, Mr. Swift purchased a white Chevrolet.

Carlton Swift, Ira Minifee and petitioner went to eat breakfast. While eating, Minifee spoke with a friend who had been working with him who told Minifee that Minifee had been terminated from his job. As a result, Minifee did not go to work that day. After finishing breakfast, Swift, Minifee and the petitioner drove to Carlton Swift's girlfriend's house. Later in the morning,

they went to Eastern State Psychiatric Hospital to visit the petitioner's girlfriend. They then went to Chestnut Ridge, Knoxville, to the Recreation Center.

Immediately before visiting the Recreation Center, Carlton Swift hit a telephone pole with his car and knocked out a headlight. Upon leaving Chestnut Ridge, shortly after they arrived, Swift, Minifee and Mr. Stacy purchased a headlight and Minifee helped Swift repair the damaged light. Afterwards, Swift, Minifee and the petitioner drove to the Lonsdale area, Knoxville, so Carlton Swift and petitioner could visit their sisters. They remained approximately twenty minutes. After leaving Lonsdale they drove to a restaurant on Magnolia Avenue, Knoxville, and ate dinner. After eating, Swift, Minifee and petitioner drove to the Greyhound Bus Terminal, Magnolia Avenue, Knoxville. Carlton Swift, who had been driving all day, made a "U-Turn" in the middle of the street and pulled into a cab zone. He told Minifee that he was going in to get some cigarettes and use the bathroom.[2] A cab pulled up behind the car blowing its horn and the cab driver held up his hand motioning to move the car. Minifee pulled the car out of the cab parking spot and drove it around the corner. At that time, petitioner got out of the car and said that he would be right back. Petitioner then went into the bus terminal.

### THE CRIME

Mr. George A. Ault, working as a ticket agent at the Greyhound Bus Terminal on July 30, 1975, was shot through the neck at approximately 9:00 P.M. and subsequently died. Two young black men, one muscular wearing an athletic shirt and carrying a pistol, and the other, a taller man with a knit hat, were seen standing before the ticket agent counter by Miss Frankie Lee Mitchell. She stated that the man without the gun, the taller, thinner one, was leaning

---

**2.** On cross-examination, Mr. Minifee was shown a copy of a statement which he gave the Knoxville Police Department on August 6, 1975, in which he stated that "Swift got out from under the wheel and told me he was going into the terminal to get some money." Minifee stated he did not remember making that statement although his signature was on it.

upon the ticket stand with his feet appearing to be off the ground, or high on his toes. After a shot was fired, the man with the gun ran around the side of the ticket agent stand, up the steps and out the door. The other man followed him.

The firing of the pistol brought a response from Mr. Ault's fellow employees. Lawrence Townsend, the operation supervisor, was in the corner office adjacent to the terminal and immediately grabbed a club and ran into the lobby. He testified that Mr. Ault was standing behind the counter with a shocked look on his face. He said to Mr. Townsend, "Larry, they shot me." Mr. Townsend ran up the stairs and out the door but did not see anyone. He then went around the dispatch office and ran into another Greyhound employee, Alice Fitch. Miss Fitch had seen Mr. Ault approximately fifteen seconds before the shooting but had walked out of the terminal to leave for home. She ran towards the terminal when she heard the shot. Townsend told her to call the police.

Mr. Townsend walked back into the terminal and upon not seeing Mr. Ault asked where he had gone. He thought that Mr. Ault had been merely wounded in the arm. When told that Mr. Ault was on the floor he went to assist him and remained with him until the ambulance arrived. None of the persons working in the bus station could identify the assailants.

## POLICE INVESTIGATION OF THE CRIME

Captain Shields L. Minor, working in the Homicide Division of the Knoxville Police Department on July 30, 1975, was the chief investigating officer on the case. He received a call at approximately 9:30 P.M. to investigate a shooting at the Greyhound Bus Terminal on Magnolia Avenue. When he arrived the uniformed officers were already on the scene and he discovered that there had been a shooting. The victim, George Ault, had already been taken to St. Mary's Hospital. Captain Minor talked with Lisa Lewis, Luwanda Blackwell, and Miss Lee Mitchell, all in transit waiting on buses at the bus terminal. He also talked with all the employees at the bus terminal, but none had actually seen the shooting.

Captain Minor then proceeded to St. Mary's Hospital to attempt to get a statement from Mr. Ault. When he arrived at the Hospital, an emergency room doctor, a Dr. Nelson, was trying to perform a tracheotomy on Mr. Ault. Mr. Ault died before he had an opportunity to talk with the police.

Captain Minor subsequently tried to contact Lisa Lewis who listed her address as Salisbury, North Carolina. He traveled to Salisbury and contacted the local police department, but they were unable to locate Miss Lewis. He was informed that she had left for Kentucky. Captain Minor asked the Kentucky Highway Patrol for assistance in locating her, but she was never found.

Captain Minor was unable to contact Miss Lee Mitchell also, but he did contact Luwanda Blackwell for identification purposes. Miss Blackwell never attended any hearings in the matter. She was subpoenaed to appear before the grand jury, but she never appeared although Captain Minor personally served her with a subpoena. Captain Minor attempted to subsequently contact her through an aunt living in Knoxville, but was unable to do so.

Captain Minor was involved later in the evening of July 30, 1975, in the apprehension of suspects in the shooting. (See discussions below in Post-Offense Activities by petitioner.)

Captain Minor's investigation revealed that Mr. Ault died with a dollar bill in his hand. There was a dollar's worth of change on the counter. As a ticket agent, Mr. Ault was responsible for the ticket counter area. Specifically, he controlled two cash drawers. One cash drawer he actually worked out of while the other was used to replenish the operating drawer with cash when needed. All the agents had been instructed to keep their drawers locked except when they were using them. Mr. Ault always kept his drawers locked unless he opened it to make

change for a ticket. When Mr. Townsend and Pedro Williams, another Greyhound employee, first arrived at the ticket counter after the shooting, both drawers were open. Mr. Townsend could not tell if any of the money had been disturbed. A subsequent examination found that nothing was missing.

Dr. Anthony Kattine, a pathologist working at the University of Tennessee Hospital, performed an autopsy upon Mr. George Ault on July 31, 1975. Mr. Ault had a gunshot wound in the neck which resulted in internal bleeding that blocked his air passage. Death was caused by choking as a result of the blocked air passage.

Dr. Kattine stated, "The bullet entered the neck on the left side at the level of the voice box, passed through the thyroid gland around the voice box, across the voice box and downward and it hit the collar bone on the right, broke the collar bone and destructed a major vessel causing hemorrhage in that area." Dr. Kattine further testified that with such a wound, a man could have maintained consciousness for a short period of time by coughing up enough blood to keep his throat clear before being overcome. The gunshot wound caused the decedent to aspirate and choke to death.

### POST–OFFENSE ACTIVITIES BY PETITIONER

Ira Minifee waited in Carlton Swift's car while Swift and petitioner went into the bus terminal. Swift came out of the terminal first, with the petitioner immediately behind him. They were walking very fast and walked directly to the car. Swift got in the front seat on the passenger side while petitioner got in the back seat. Ira Minifee noticed a pistol in petitioner's hand and the petitioner said, "I shot me a motherfucker." Swift replied, "I don't think you hit him." According to Minifee, the petitioner wanted to turn on the radio to see if he could hear anything about the shooting.

Minifee drove Swift's car directly to Montgomery Village where Martha Mack, his girlfriend, was living. Regina Mack and Martha Mack, Regina's sister-in-law, were

there. There was no further conversation until they arrived at Montgomery Village. When the petitioner walked into the apartment he again said, "I shot me a motherfucker." Swift asked if anyone wanted something to drink, and Swift, Minifee and petitioner went together to a liquor store on old Maryville Pike in Knoxville. They purchased some whiskey and wine. They then returned to Martha Mack's apartment.

Regina Mack was staying with Martha Mack at Martha's apartment on July 30, 1975. She was attempting to get a ride to the other side of town. Swift and the petitioner volunteered to give her a ride to the Walter P. Taylor homes. Swift asked Minifee if he wanted to go anywhere, and Minifee told him he wanted to go to the El Rocco Club, a night club on the corner of Vine Avenue and Central Avenue. Swift, Regina Mack, Minifee and petitioner left together in Swift's car. Swift was driving. When they reached the El Rocco Club, Minifee got out of the car. He turned around and saw a policeman running down the sidewalk. He also saw several police cruisers. Somebody shouted, "Get off the corner, the man is looking for you." As a result, Swift drove off suddenly.

Detective Ray Perry of the Knoxville Police Department was a patrol officer on July 30, 1975. He noticed a white 1964 Chevrolet with a drive-out tag on the window in front of the El Rocco Club. Earlier that night, the dispatcher had given out a description of a car meeting the same description that was involved in a shooting. When he pulled up at the intersection, he glanced over and saw the car and then, as he turned through a parking lot, the car took off very fast.

He began to pursue and immediately called the dispatcher and told him he was in pursuit of a car. The white Chevrolet turned into a parking lot and circled the parking attendant's shed. Detective Perry went around the shed also and attempted to block the car. However, the other car started straight towards him, and he moved his cruiser to avoid being struck. He continued pursuing the white Chevrolet, which

contained three people. During the chase, Carlton Swift, Regina Mack and the petitioner were the occupants in the white Chevrolet. Regina Mack testified that during the chase petitioner said he had killed someone. Over objection of defense counsel, she stated that Swift replied, "You have the nerve to rob a person, you have the nerve to kill somebody, but you don't have sense enough to wait on the money."

The chase lasted five to ten minutes and ended when the driver of the white Chevrolet, Carlton Swift, lost control of the car and wrecked in a field. One passenger ran from the car and disappeared. Detective Perry pulled the front of his car into the field and shone his lights across the field. His vision was poor because of the high weeds. He saw a black female run from the car and a black male. He fired a shot and struck Carlton Swift in the leg. Detective Perry did not see the third subject, Stacy, or where he went. The third suspect was not apprehended at the scene nor could he be found in town. Captain Minor arrived at the scene after the accident had occurred. Carlton Swift and Regina Mack were apprehended and taken into custody.

Kathy Stacy, the defendant's sister, learned of the shooting when the petitioner came to her apartment on July 30, 1975. He "said something about a shooting at the Greyhound Bus Station." He stayed there between five and ten minutes and left. She stated that "[h]e was nervous, his eyes all glittery, and I couldn't talk to him because he wouldn't stand still." .

Ira Minifee saw petitioner at Martha Mack's apartment approximately two hours after the wreck. Petitioner wanted to know if he could stay there for the night. Minifee told him that Swift had been caught earlier in the night. He had personal knowledge of that fact because he had been to the scene of the accident after the police arrived. Minifee told the petitioner that the police would be looking for him and that he was concerned about his children. Petitioner said "all right" and walked away.

Lloyd Robinson, administrative assistant for the extended treatment program at Central State Hospital, saw the petitioner during the first week of August at a nightclub in Nashville. He talked with the petitioner for approximately five minutes. He also saw petitioner the next day by the Hyatt Regency Hotel, in downtown Nashville. Mr. Robinson did not know that the petitioner was wanted for a crime in Knoxville when he saw him. Later, he was informed that the petitioner was apprehended in Nashville.

Petitioner was arrested in Nashville in early August. He was transported to the Knoxville City Jail where he remained until he was sent, eight months later, pursuant to court order, to Central State Hospital, F.S.D., in Nashville.

The petitioner was placed in a line-up conducted by Lt. Charles Long, Chief Jailer of the Knoxville Police Department on September 2, 1975. Lt. Long testified at trial, over the objection of defense counsel, that prior to the line-up, the people who were to be in it were in the booking room, which also serves as the jail office. He overheard petitioner talking to Carlton Swift or one of the other men who were to participate in the line-up and say, "I'm guilty." Lt. Long stated he was not trying to eavesdrop nor was he questioning Mr. Stacy. The petitioner was in custody on an armed robbery charge, but the line-up concerned the shooting at the Greyhound Bus Terminal. Lt. Long was not sure what the petitioner was talking about.

## THE TRIAL

Petitioner pleaded not guilty to the charges of murder, the first count of the indictment, and murder in the perpetration of an armed robbery, the second count of the indictment.

The State called Captain Shields Minor who testified regarding the investigation of the shooting at the Greyhound Bus Terminal, Knoxville, on July 30, 1975. Detective Ralph Moore told of the chase and apprehension of Carlton Swift and Regina Mack and the disappearance of a third suspect

who was a passenger in the car with Swift and Mack.

Four persons who were at the Greyhound Bus Terminal on the day and hour of the shooting were called to testify. Miss Frankie Lee Mitchell, a passenger in transit, described the two young black men who were involved in the shooting, but she could not identify either of the two men. Lawrence Townsend, Alice Fitch, and Pedro Williams, all employees of Greyhound, described the sound of the shooting, Mr. Ault's injuries, and the condition of the ticket counter immediately following the shooting. They did not witness the shooting and could not identify the participants.

Lt. Charles Long testified concerning petitioner's arrest in Nashville and subsequent return to Knoxville. He recounted the lineup which the petitioner was placed in and the statement of the petitioner which he overheard.

Ira Minifee, an indicted accessory, recounted the pre-offense events and post-offense activities of Carlton Swift, himself and the defendant, including petitioner's statements about the shooting. There was a question as to what kind of "deal," if any, was given Mr. Minifee in order for him to testify. Mr. Minifee, at the time, had charges pending against him. He stated that he was "not really concerned about it." Those charges, receiving and concealing stolen property, as a result of his testimony at trial, were to be retired.

Mr. Minifee had the opportunity to deal with the petitioner three or four days before the shooting and spent all of July 30, 1975, with him. He knew that petitioner had been a patient at Eastern State Psychiatric Hospital. Minifee felt that there was something wrong with petitioner. He observed that the petitioner acted nervous, that he would sit and twiddle his thumbs and look like he always had something on his mind. Also, he stated that petitioner would roll his eyes back into his head and look as if he was off in a daze. The petitioner would sit down and stand up again because he could not stay in one place.

Mr. Minifee also testified that the petitioner would laugh at inappropriate times when nothing had been said and that he had an uncontrollable laugh which was not in response to any type of joke. It was also very hard carrying on a conversation with petitioner. He stated that neither Swift nor he could communicate with the petitioner.

Mr. Minifee testified that petitioner did not take any medication during the three or four days prior to the shooting, although he was drinking a considerable amount of liquor given to him by Carlton Swift. It was Mr. Minifee's opinion, based upon his observations of the petitioner before and after the shooting, that petitioner was very disturbed.

Regina Mack testified as to her post-offense activities with the petitioner. There was a question of her use of the Fifth Amendment during her testimony. She was represented by counsel. Miss Mack, as was the court, was concerned about a possible "accessory to murder" charge which might be brought against her as the result of her testimony. She was questioned about the truthfulness of a statement which she had given the police, and, upon the court ordering her to answer, stated that the statement she gave was correct. She was subsequently questioned and testified to her involvement with petitioner, including the chase and statements made by petitioner.

July 30, 1975, was the first time she had any dealings with petitioner. She observed that he was "pretty fretful" and that he rolled his eyes back into his head. She thought that he was very strange because of the way he was acting.

After Regina Mack testified on recall, the State rested its case. Defendant's counsel then made a motion to dismiss the case. The court denied the motion as to the first count of the indictment charging the petitioner with murder, but sustained the motion to dismiss as to the second count of the indictment charging petitioner with murder in the commission of an armed robbery, ruling that there was no proof that there was a robbery.

The first witness called by petitioner was Mr. William Waters, Ira Minifee's attorney. Mr. Waters testified that Mr. Minifee was not correct when he had testified earlier that he had never been promised that he would not have to testify against Carlton Swift. Assistant District Attorney General Gill had advised him, in Mr. Minifee's presence, and, in fact, General Gill spoke directly to Mr. Minifee and stated that it would not be necessary for Mr. Minifee to testify against Mr. Swift. Mr. Waters further testified that Mr. Minifee had a pending charge of receiving and concealing stolen property, but that an agreement was reached between him and Assistant District Attorney General Nichols. As a condition of Mr. Waters recommending to his client that he testify, rather than take the Fifth Amendment, the charge would be nolle prossed. Mr. Waters also said that he was in the courtroom during Minifee's testimony and that it was the same testimony that he had told him since he had been representing him for the past two years.

Mr. John Gerdes, Director F.S.D., in Nashville, next testified for petitioner. Mr. Gerdes is a licensed psychological examiner. After stating his qualifications he was held to be an expert in the particular field of psychology as a psychological examiner. Mr. Gerdes testified as to the petitioner's three admissions to Central State Hospital. He had personal contact with the petitioner during his three admissions and had an opportunity to observe him during these admissions.

He stated that there are certain particular personality traits or actions of conduct on the petitioner's part that he observed that were consistent throughout his three admissions. Mr. Gerdes stated that petitioner behaved in a strange and bizarre manner. He seemed confused and disoriented and would go around with a silly smile on his face and at times would laugh for no apparent reason. He had a glassy sort of stare in his eyes and would report some strange things to the staff members of the ward. He characterized petitioner's overall behavior during his three admissions as fairly calm. However, during the first two months of each admission he was more agitated and would pace around the ward and walk up and down the halls frequently.

Mr. Gerdes attempted to test petitioner during his second admission in March of 1975 but was not completely successful. He attempted to give him a sentence completion test and a personality test, the Minnesota Multiphases Personality Test (MMPR). Mr. Gerdes testified that there are approximately 300 to 400 other psychological tests that could have been given to the petitioner. An electroencephalogram was given the petitioner which was normal. No tests were made on the petitioner in 1976 because Mr. Gerdes felt that petitioner was too ill to be tested.

Mr. Gerdes testified that he had formed an opinion as to the petitioner's mental condition. He believed that the petitioner was mentally ill, suffering from schizophrenia. He considered petitioner to be mentally ill in June of 1975 because he considered him a chronic type mental patient. Though his condition may be in remission at some times and he may not appear to be outwardly psychotic, he is always basically mentally ill. Mr. Gerdes felt that when the petitioner returned to the F.S.D. on March 9, 1976, he was having one of his chronic episodes and was mentally ill at that time. He also stated, on cross-examination, that he did not testify as to the petitioner's mental condition on July 30, 1975, because he was not asked. He also stated that in his opinion it is not true that a simple schizophrenic would have the capacity to appreciate the wrongfulness of his conduct because there are some simple schizophrenics that could appreciate the wrongfulness of their conduct, while there are others who could not.

Mr. Gerdes, as Director of F.S.D., is in charge or has control of the records that are kept in the ordinary course of business. They include nursing notes, diagnosis of the staffing of the patients, and the doctor's notes. Mr. Gerdes testified that he is familiar with how the nursing observation notes are prepared. There are approximately

four psychiatric technicians on each ward where a patient is kept. On each shift they record a brief note on the patient's chart when something important happens. Mr. Gerdes referred to the following specific nursing notes:

The patient appears to have regressed back to where he was when he was here before. He walks the halls and laughs and talks to himself again. He said, "I saw a black ghost with no shoes on, with several heads, with a horn coming out of its nose. He was dressed in white pants. He didn't have no matches, he had to light his cigarette off mine." Patient is in transition; he was trying to deal with his feelings but now he is regressing in order to escape reality. (March 21, 1976)

. . . .

Mr. Stacy seems rather confused; he does not know how long he has been here; has dreamy expression on his face. Mr. Stacy has also been smoking his cigarettes down to small butts and then he swallows it after extinguishing the fire in his mouth. When asked why, he stated that it gives him something to do and that it doesn't hurt. (March 26, 1976)

. . . .

Patient spent most of the shift yesterday walking the hallway and laughing inappropriately. (March 31, 1976)

Upon cross-examination, over the objection of defense counsel, Mr. Gerdes read the following notes also:

Patient talked with his relatives on that shift. He worked in the kitchen. Patient is well groomed, he is responsive to instructions and ward routine. (July 11, 1976).

. . . .

Stacy is still one of my best patients. He is among the quietest patients on the ward. (July 13, 1976)

. . . .

I was talking to this patient and patient said he would like to go back to Eastern State Hospital. Patient also said he knew that what he'd done was wrong. He's working in the kitchen and going real good and he causes no problems in the ward and gets along with the other patients. (August 19, 1976)

Mr. Gerdes concluded his testimony by stating that the fact that during periods of time during the third admission that the petitioner got along well on the ward is consistent with his own observations and that he believes the petitioner was medicated during that period of time. From the dates on the foregoing observations, the petitioner would appear to be more acutely ill during the first several months of the admission. However, he would be placed on medication, and that fact, coupled with the fact that the hospital is a comparatively safe, secure, low stress environment, would explain the patient's improved condition, according to the witness. The petitioner would not be medicated when he was returned to F.S.D. It would take about a month or six weeks for his behavior to come under control. Mr. Gerdes stated that the petitioner would be a good patient after control was achieved.

The next witness called by the petitioner was Dr. Frank L. Luton, the Assistant Superintendent for Clinical Psychiatric Services at the Middle Tennessee Mental Health Institute in Nashville. Dr. Luton is a licensed physician. The court found Dr. Luton to be qualified as an expert in the field of psychiatry.

Dr. Luton examined the petitioner while he was at the Forensic Services Unit at Middle Tennessee a number of times in 1976 and 1977. He also observed him in the dining room and interviewed him at the staff meetings at which he presided. He stated that the petitioner had hallucinations, heard voices and saw things that were not there. Dr. Luton considered petitioner to be schizophrenic at all times and when not medicated to be "grossly psychotic, grossly ill, mentally ill."

Dr. Luton did not perform any formal testing on the petitioner although formal testing is used for diagnostic purposes. He did not feel that it was necessarily important to perform psychological testing on petitioner. He stated that "[i]t doesn't take a psychological test to tell that this man

[Stacy] was a schizophrenic, that he was seriously mentally ill."

Dr. Luton had formed an opinion concerning the petitioner's mental condition. He found him to be mentally ill, suffering from schizophrenia, chronic and undifferentiated type. In April of 1976, he considered petitioner to be acutely psychotic.

Dr. Luton testified that petitioner told him on September 3, 1976, that he had been off his medication for about two weeks at the time of the shooting and that he begins to hallucinate when not on medication. That the petitioner was not on medication during the eight-day period between his release from Eastern State on July 23, and the shooting is consistent with Dr. Luton's understanding of the petitioner. Dr. Luton stated that petitioner could not be trusted to take his medication outside of an institution because he gets the idea that he does not need it anymore. Thus, it was Dr. Luton's opinion that when the petitioner was allowed to leave a mental institution, he would become grossly psychotic, grossly ill because of the lack of medication. Although petitioner is not a danger to himself or others when he is medicated, he is dangerous when off his medication. Dr. Luton stated, "the minute that he, [a chronic schizophrenic], ceases taking his medication, he's losing ground." Therefore, if petitioner had been off of medication for two weeks prior to the shooting the chances are that he would have been seriously mentally sick at that time and not able to judge the consequences of his acts.

Dr. Luton was asked a series of questions regarding the application of the test set forth in *Graham v. State*, 547 S.W.2d 531 (1977). It was Dr. Luton's testimony that in his medical opinion, William Earl Stacy did not understand the wrongfulness of his act on July 30, 1975, the date of the murder. He was further of the opinion that petitioner could not conform his conduct to the requirements of the law on July 30, 1975.

Dr. Aaron Means, Administrator and Coordinator for Pupil Personnel for Knoxville City Schools, testified next. He is custodian of the student records for the Knox-

ville City Schools and had a copy of the petitioner's school records.

Dr. Means testified that the petitioner was in the first grade in 1958–1959 and in 1959–1960. He eventually completed the ninth grade in school. Petitioner made all "F's" in the tenth grade in 1969. While in the sixth grade the petitioner was given a reading test. Mr. Stacy scored a 3.8 which registered in the lowest tenth percentile. He was also given a spelling test in which he registered in the fifty-sixth percentile.

Pursuant to a stipulation between the State and the defense, the testimony of Ms. Becky Smith and Mr. J. B. Jackson was admitted. Mr. Jackson was also briefly examined. Ms. Becky Smith is a social worker and, during the petitioner's three admissions to F.S.D., worked with him in that capacity. Her testimony corroborated Mr. Gerdes that during the first several months of the petitioner's three admissions she observed him exhibit a kind of inappropriate laughter and giggling. He paced the halls in an excessive manner, and his emotions and his affect were wrong.

Mr. J. B. Jackson, presently a social worker at the Drug and Alcohol Unit at F.S.D., was an aid at F.S.D. during the petitioner's second and third admissions. He observed the petitioner during those two admissions, and, at least during the first several months of those admissions, petitioner exhibited inappropriate laughter, told bizarre stories, and, in his opinion, was hallucinating. He was keeping the other patients awake with his laughter one night, and when asked what was going on, petitioner told Mr. Jackson that he saw a ghost. Mr. Jackson felt that the petitioner was mentally ill during his second and third admissions.

Mr. Jackson also testified that within three days of his third admission the petitioner was playing basketball and seemed to be in good spirits on March 21, 1976. The petitioner also worked in the kitchen later and was a good worker.

The next defense witness called was Mr. Kim Tollison, Assistant District Attorney General for Knox County, Tennessee. Prior

to his assuming that position, Mr. Tollison was a staff attorney with the U.T. Legal Clinic, and while in that capacity, represented the petitioner both before and after the shooting.

On July 8, 1975, the petitioner had a commitment hearing in Knox County Criminal Court, Division II. Petitioner had pending criminal charges at that time which occurred between October 1974 and July 8, 1975. He was represented by Mr. Tollison. Prior to that commitment hearing on July 8, 1975, Mr. Tollison tried to converse with the petitioner regarding those burglary charges. Mr. Tollison found it impossible to communicate with Mr. Stacy. Petitioner would be asked questions but would not respond. He would only sit and stare blankly. Mr. Tollison also represented the petitioner after July 8, 1975, concerning the murder charges in this case. Mr. Tollison attempted to talk with the petitioner subsequent to the date of the murder, July 30, 1975, but the petitioner would ramble along about something that did not appear to have any connection with the question asked. Petitioner did not make any sense to him. He sat and stared straight ahead.

Mr. Tollison stated that as a result of his conversations with the petitioner prior to July 8, 1975, it was his opinion that petitioner was mentally ill. He further stated that based on his conversations with the petitioner in August and September 1975, that the petitioner was mentally ill during those months.

As stated earlier, Mr. Tollison represented the petitioner at a court hearing in Division II, Knox County Criminal Court on July 8, 1975, the Honorable Richard Ford presiding. The petitioner had pending burglary, larceny and shoplifting charges at that time. The purpose of that hearing was to determine whether the petitioner was competent to stand trial or whether he should be committed to an institution. The court found the petitioner incompetent, dangerous to himself and others, and committed him to the Commissioner of the Department of Mental Health for an indefinite period. Mr. Tollison was never notified by Eastern State Psychiatric Hospital that the petitioner was to be, or was, released on July 23, 1975, just prior to the murder.

The next witness called was Judge Richard Ray Ford. He was found to be an expert in the field of mental health law, as applied in the criminal courts of Tennessee.

Judge Ford presided over the July 8, 1975 competency and commitment hearing regarding the petitioner. Petitioner was charged with burglary, larceny, receiving and concealing stolen property and shoplifting at that time. Dr. Cyrus Higgs, of the Tennessee Department of Mental Health, testified at that hearing. The court found the petitioner incompetent to stand trial and because of his mental illness, to possess a likelihood to cause serious harm to himself or others, and to be in need of care and treatment in a mental hospital. However, petitioner was determined not to be in need of a maximum security facility at that time because his condition was such that if he continued with his medication and treatment he would be manageable at Eastern State. The petitioner was sent to Eastern State for an indefinite period. Judge Ford was never notified by Eastern State that petitioner was discharged.

Judge Ford subsequently learned that the petitioner had been illegally discharged from Eastern State and was in custody, suspected of murder. On February 17, 1976, Judge Ford re-committed the petitioner. His reasoning was that "obviously the Court's and other parties' concern about his being dangerous to himself and others has been borne out by what has happened."

Judge Ford also stated that based upon his own observations of the petitioner and the information available on July 8, 1975, that he considered petitioner to be seriously mentally ill on July 8, 1975, approximately three weeks before the murder.

The defense next called Linda Chapman, presently a counselor at Child and Family Services in Knoxville. During the summer of 1975, she was employed by Eastern State Hospital as a social worker and was part of a treatment team which worked with the petitioner. She prepared the discharge pa-

pers for the petitioner. She stated that petitioner was discharged on July 23, 1975, without medication or a prescription and that no aftercare appointment was made at a mental health center although such an appointment was normal practice at that time. The State attempted to have Linda Chapman testify as to the contents of discharge summaries, however, the trial judge sustained the defense objections and the discharge summaries were marked as Exhibits 8 and 9 for *identification only.* The discharge summary was later discussed at length by the Court of Criminal Appeals even though the summary was never put in evidence.

The petitioner's next presentation of proof consisted of the reading of the testimony of Dr. Cyrus Higgs, a psychiatrist at Western State Psychiatric Hospital. The parties stipulated that, if Dr. Higgs were called, his testimony would be as it had been on July 8, 1975, and that testimony was read to the jury. That testimony is as follows: Dr. Higgs was a witness at the July 8, 1975 commitment hearing before Judge Ford. He was found to be an expert witness in the field of medical psychiatry.

Dr. Higgs observed and tested the petitioner when he was first admitted to F.S.D. on March 5, 1975. He also had the benefit of the reports from the doctors at Helen Ross McNabb Center in Knoxville, who had seen the petitioner before he was sent to Nashville. Dr. Higgs was also a member of petitioner's April 1, 1975, staffing team. The team felt that the petitioner was not competent to stand trial at that time and that an insanity defense could probably be supported.

Dr. Higgs testified at the July 8, 1975 hearing that the petitioner was on medication during the time he was at Central State (March 5, 1975—July 1, 1975) and that a prescription was issued for him to take with him when he left. He was still on that medication on July 8, 1975. Dr. Higgs felt that without his medication, there would exist a possibility that petitioner could have a relapse, particularly if he was back in the same sort of stresses, situations, or environments in which he developed the illness in the first place. Dr. Higgs concluded by affirming "that without the controlled discipline . . . and the giving of his medication, he [Mr. Stacy] would probably have a relapse, and that this relapse could cause serious harm to himself."

Interestingly, during the cross-examination of Dr. Higgs by an Assistant District Attorney General, Dr. Higgs stated that William Stacy was insane under the M'Naghten Rule. This related to December 1974, but is obviously relevant in determining insanity on July 30, 1975. There was finally a question as to whether there would be a danger of serious harm to others if the petitioner stopped taking medication and had a relapse. Dr. Higgs said that there was a danger of serious harm to himself and to others.

Mr. Lloyd Robinson, an administrative assistant for the extended treatment program at Central State Hospital, was the next defense witness. In the summer of 1975, he was employed at the Forensic Services Division as an administrative assistant. He was in charge of the work program there. He was acquainted with the petitioner in that capacity since Mr. Stacy worked for him while medicated. Petitioner was a good employee and did not cause any trouble. Mr. Robinson was aware that the petitioner had been sent to Eastern State Hospital in July 1975.

By happenstance, he saw the petitioner during the first week of August 1975 at a night club in Nashville. This was following the murder, but prior to the petitioner's arrest. He attempted to talk to petitioner, but the conversation was basically unintelligent, although the petitioner did ask about some of the employees and patients at Central State. Mr. Robinson stated, "It was a kind of unintelligent conversation. He heard me but I don't believe he really did." Petitioner seemed to be very nervous. His voice was trembling, and he had a strange smile on his face when he grinned.

Mr. Robinson also saw the petitioner the next day standing with a group of people by the Hyatt Regency Hotel in downtown

Nashville. He observed the petitioner though the petitioner could not see him. He appeared nervous and his left hand was shaking.

Upon cross-examination Mr. Robinson conceded that it would not be unusual for a person to be nervous who was being sought by the police.

Based on his observations and conversations with petitioner, Mr. Robinson formed the opinion that the petitioner was mentally ill as of the first week of August 1975. He also did not think that the petitioner was medicated when he saw him, although he did not know for sure.

The defense next called Reginald Leverette. Mr. Leverette was in jail with the petitioner from September 2, 1975, until February 1976. He had not seen the petitioner, except in passing in the county jail the day before he testified, since February 1976.

Mr. Leverette stated that he attempted to converse with the petitioner during the fall of 1975 when they were in jail, but it was impossible. He would start talking about one topic, but the petitioner would talk about something completely different. Also, the petitioner thought he was a member of the President's Cabinet. "If I asked him something, he would tell me he had to go talk with the President, or something." Mr. Leverette observed the petitioner walking the floor "all the time," naked, with toilet paper sticking out of his nose. He also observed the petitioner wake out of his sleep laughing. Petitioner was also very nervous.

Mr. Leverette formed an opinion as to the petitioner's mental condition during the fall and winter of 1975. He stated that the petitioner "ain't got good sense, he's crazy." Petitioner was not on medication when Mr. Leverette was in jail with him.

Ruby Patterson was the next witness for the defense. She and Kathy Stacy, petitioner's sister, visited the petitioner during July 1975 when he was at Eastern State Hospital. She was unable to carry on a conversation with him because he laughed all the time and could not sit still. Petitioner was constantly "up and down." She observed that his mouth quivered all the time, that his hands shook, that his eyes were not clear, and that the petitioner smoked a lot.

As a result of her attempted conversations with the petitioner and her observations of him in July 1975, Ms. Patterson formed an opinion as to the petitioner's mental condition. She said, "[T]o me he just didn't seem right." He didn't seem like people that she was around all day.

The defense's next witness was Kathy Stacy, petitioner's sister. She testified that after the petitioner left Eastern State, after his first visit in October 1974, he lived with her and her family. He was very nervous. The petitioner did not sleep well because he saw ghosts at night. He told his sister that things were in the house which were not there. The petitioner had a habit of turning the gas stove on at night and leaving it on. He burned pots on the stove.

In July 1975, Kathy Stacy visited the petitioner almost every day when he was at Eastern State Hospital on his second admission. She stated that "[h]e still had problems." He would giggle and laugh and she could not carry on a conversation with him. The conversations were unintelligible. On one particular day she took someone with her to visit petitioner. Petitioner ran and hid from her behind a bed. He acted like a child. He was also very nervous and walked constantly. She considered him to be mentally sick.

When the petitioner was discharged from Eastern State on July 23, 1975, she picked him up. He did not have any medication with him, nor did he have an appointment at a local mental health center. She stated that when she got home after picking the petitioner up she called Eastern State to find out if he, in fact, had been discharged. She felt, because of his conduct, that he had escaped. She could not believe that the petitioner had been discharged.

Petitioner lived with his sister after he was discharged on July 23, 1975. Kathy Stacy testified that he "acted strange."

She could not talk to him because of his giggling. He would walk into her bedroom at night and tell her that he was seeing ghosts. On one occasion the petitioner turned all the lights on in the house to show his sister the ghosts in the house. Petitioner broke dishes around the house and complained of people touching him when he slept. One day the petitioner put an unloaded pistol to her son's head and told his nephew that he would "blow his brains out." She stated that, based on her observations of the petitioner while he lived with her during July 1975, he was "sick" and "had a problem."

Kathy Stacy visited the petitioner when he was in jail after the shooting. She testified that his condition was the same and that he was still giggling and laughing.

The last witness called by the petitioner was Adolph Siegmann, a licensed psychiatrist who was presently employed at the Veterans Administration Hospital in Murfreesboro, Tennessee. He was previously employed as a psychiatrist at Central State Hospital, F.S.D., for 14 years. After stating his qualifications, the court found Dr. Siegmann to be an expert witness in the field of psychiatry.

Dr. Siegmann was acquainted with the petitioner during his three admissions to F.S.D. He had numerous occasions to observe and converse with the petitioner. When the petitioner first came to F.S.D. in 1974, he was sent from prison. He was about to be released from the penitentiary but was in such an emotional state of mind that he could not be integrated back into society. He was rather flatly relating, a somehow pleasant but inappropriately organized person. Whenever he talked about serious matters he giggled in completely inappropriate ways. Petitioner was hallucinating. When the petitioner next came back to F.S.D. in March 1975, he was "sullen, calm, composed to the point of indifference." His effect was flat and inappropriate. He laughed in a silly way. Dr. Siegmann also saw the petitioner when he first returned to F.S.D. on his third admission in March 1976. At first he demonstrated no overtly psychotic symptoms. However, fairly early after his arrival in March of 1976, the petitioner's behavior disintegrated, and he appeared disoriented.

Dr. Siegmann stated that as a result of his observations of the petitioner he was of the opinion that the petitioner was suffering from schizophrenia. Dr. Siegmann continued and stated that "[schizophrenia] is like a camilian [sic], often changing its whole kind of character, depending on the kind of stresses, the timing of stresses, the timing of support, and similar outward circumstances." As a result, petitioner was subject to periods of relative calm and appropriate behavior. There are also periods when the illness manifests itself and more or less takes over. Dr. Siegmann testified that when the petitioner was not under enough medication, or there were special stresses, then the illness manifested itself, and he was overtly psychotic. If the petitioner was not medicated during the trial he would be very restless, fidgety, inappropriately giggling, to the point that to close observers he would be embarrassed or annoyed by his behavior in court. Further, if he had been off his medication for a longer period he would interrupt the court proceedings with angry outbursts.

Regarding the shooting on July 30, 1975, and referring to the *Graham* test, Dr. Siegmann testified that, based on his observation of the petitioner, his diagnosis of the petitioner's mental illness and his past knowledge of the petitioner, he was of the opinion that petitioner could not conform his conduct to the requirements of the law at the time of the shooting. Dr. Siegmann conceded that without being present or observing the situation in which the patient is acting, it is not possible for a psychiatrist or any other person to know whether a schizophrenic is in a period where he has a reasonable amount of control over his conduct or if he is in a period where the disease has reasserted itself. But he stated that, based on his knowledge of the petitioner, if it were brought to his attention that on a given day the petitioner had been extremely nervous, could not stand still, had been

laughing and giggling inappropriately, that would indicate to him that the petitioner's state of schizophrenia was not in remission and that he was disintegrating.

In referring again to the *Graham* test, while Dr. Siegmann did not feel that the petitioner could conform his conduct to the requirements of the law, he did believe that petitioner could "vaguely" appreciate the wrongfulness of his act. It was Dr. Siegmann's opinion that the petitioner understood himself to be in a situation which was "legally endangering to him."

Dr. Siegmann also testified as to the effect of medication on the petitioner. During the first several months of his second admission, petitioner was psychotic and on April 1, 1975, a staff meeting conclusion was that the petitioner was "not competent, judicially commitable but not in need of maximum security." Prior to July 1, 1975, the petitioner's condition had symptomatically improved. Medication played a decisive role in that improvement because without drugs the petitioner would disintegrate even in the community of the hospital.

Dr. Siegmann stated that in the petitioner's discharge summary it was indicated that it was very important that his medication be maintained. Petitioner's condition could deteriorate if medication was not continued. During the last several years, when the petitioner was not taking his medication, he became psychotic. Further, Dr. Siegmann testified that when the petitioner was not under a supervised environment he would not take his medication because he did not understand the significance of it and because he did not want the psychiatrists to exercise power over him.

The defense rested at the end of Dr. Siegmann's testimony.

In rebuttal the State called Dr. Frank Beasley, a licensed psychiatrist from Eastern State Hospital. He was found to be a competent expert and qualified in the field of psychiatry.

The Assistant District Attorney posited a hypothetical question to Dr. Beasley. Dr. Beasley was asked to assume that two men went into the Greyhound Bus Terminal and attempted to rob someone working there and that someone was killed during the attempted robbery; that the two men fled the scene of the shooting and that one said he shot someone; that later a chase involving suspects of the shooting and the police ensued in which, after the automobile being chased was involved in an accident, one of the suspects disappeared and was eventually arrested in Nashville. Dr. Beasley was also asked to assume some facts regarding the behavior of the person with the gun. Pursuant to the hypothetical question, Dr. Beasley stated that the hypothetical person did realize what he was doing at the time of the shooting. The shooting sounded planned, organized, and when it did not work out, he realized the consequences and fled.

A hypothetical question was attempted to be asked concerning the second prong of the *Graham* test—whether or not the hypothetical person could conform his conduct to the requirements of the law. However, the court did not allow an answer to the question based upon his own personal observations and dealings with petitioner.

Dr. Beasley concluded his testimony by stating that as a psychiatrist he would, in attempting to make a diagnosis of a person at a particular time when a crime is committed, ask him the circumstances surrounding the alleged crime.

Neither the State nor the petitioner called additional witnesses.

This long review of the facts was deemed necessary not only because of the reviewing standards of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), but also because of the troubling nature of this, and all, heinous crimes where the plea is not guilty by reason of insanity. Relatively great strides have been taken in the law as it relates to the mentally ill. Although no universally satisfactory test of legal sanity has been devised, nevertheless, the criminal law does not attach penalties for acts for which the perpetrator was not responsible. But this is really the beginning of the inquiry rather than the end.

The Legislature has thus far failed to devise constitutional programs for dealing with those persons who are incompetent to stand trial or who are acquitted as not guilty by reason of insanity. In the Acts of 1974, the lawmakers included in the statutes T.C.A. § 33–709 which merely provides that persons acquitted by reason of insanity may be subject to hospitalization subject to §§ 33–603 or 33–604 of the Code. However, the provision is discretionary with the district attorney general who may or may not seek custodial care for the acquitted defendant. The provision has been characterized as "cumbersome and awkward" as well as "inadequate." *Edwards v. State*, 540 S.W.2d 641, 657 n. 6 (Tenn.1976) (Henry, J., dissenting), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 777 (1977).

■ Even if commitment is sought and received, the Supreme Court requires that criminal committees be afforded the same due process rights as civil committees including a precommitment hearing and periodic examinations at reasonable intervals. As soon as his condition warrants, he must be released. *See generally, Jackson v. Indiana*, 406 U.S. 715, 95 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

The court is not unmindful of the potential for harm which may result if the habeas corpus petition is meritorious. All too often a person dangerous to himself and others may return to the streets after a brief stay in a mental institution. Obviously this has already happened to the petitioner, Stacy, once before resulting in a tragic murder. A highly problematical area is the use of drugs in treating the kinds of illnesses which afflict Stacy. They tend to create what the wags refer to as "synthetic sanity" or "chemical competency" which can rapidly wane if use of the medication is discontinued. This, too, happened to Stacy.

Stacy was suffering from "schizophrenia, chronic, undifferentiated type." *Stacy v. Tennessee*, 556 S.W.2d 552, 553 (Tenn.Crim. App.1977). At the time of his competency

hearing, he was being treated with Haldol, a tranquilizing, anti-psychotic medication which helps " 'people to experience less distress, anxiety or panic, or depression, which, therefore, helps them to stay more composed, more aware of the world and thereby able to function more appropriately to their own benefit.' " *Id.*

Although the trial court found Stacy incompetent to stand trial, this determination was overturned at the appellate level. The Court of Criminal Appeals in the preceding case ruled that as long as Stacy was medicated he was competent to face trial. The court noted that in the absence of such medication the likelihood was that Stacy would never be competent. *Id.* at 559.

In addition to the foregoing, the court is further hampered in its remedial possibilities in that it cannot order a new trial for the petitioner in the event that his petition is granted. In a case originating in this court, Gray, C. J., the Sixth Circuit Court of Appeals overturned a bank robbery conviction, ruling that the government had not proved sanity beyond a reasonable doubt and remanded the case to the district court to determine whether a directed verdict of acquittal should be entered or a new trial ordered. *United States v. Burks*, 547 F.2d 968 (6th Cir. 1976).

On certiorari, the Supreme Court reversed and remanded. It was the unanimous determination of that Court that the double jeopardy clause of the fifth amendment barred a second trial where there was insufficient evidence to sustain the verdict of the jury. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). A granting of Stacy's petition would likewise prevent retrial.

The foregoing is mentioned in order to underscore the great seriousness with which this matter has been reviewed. This is not the form of appellate review which permits the correcting of an error. Rather, it is all or nothing: the state either made its conviction or it made a mistake. If the latter was the case, it cannot be undone.

The court turns first to the petitioner's claim that his sanity was not proved beyond a reasonable doubt. In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2787, 61 L.Ed.2d 560 (1979), the Supreme Court held that in federal habeas corpus proceedings involving the sufficiency of the evidence, the relevant question is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of crime beyond a reasonable doubt." 443 U.S. at 319; 61 L.Ed.2d at 573.

■■ The law of Tennessee, of course, is determinative of the issue of sanity in this matter. *Moore v. Duckworth*, 443 U.S. 713, 714, 99 S.Ct. 3088, 3089, 61 L.Ed.2d 865, 868 (1979). In Tennessee, it is well established that once the evidence adduced by either the defense or the prosecution raises a reasonable doubt as to the sanity of the defendant, the burden then shifts to the state to prove the defendant's sanity beyond a reasonable doubt as an essential element of the crime. *See, e.g., Collins v. State*, 506 S.W.2d 179 (Tenn.Crim.App.1973).

The benchmark decision on the law of insanity in Tennessee is *Graham v. State*, 547 S.W.2d 531 (Tenn.1977). Therein, it was expressly held that the rules set down in *Graham* would apply to all criminal trials begun on or after the date of the release of that opinion; hence, it applies here. *Id.* at 544.

*Graham* adopted the Model Penal Code formulation of insanity drafted as follows:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law.

(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Tennessee adopted a version of the above which substituted the word "wrongfulness" for "criminality." 547 S.W.2d at 543.

The Tennessee Supreme Court further approved a set of questions for the jury which succinctly state the law as adopted and focus inquiry on the relevant issues. These questions were formulated by Judge Harry Phillips in *United States v. Smith*, 404 F.2d 720 (6th Cir. 1968). They are as follows:

(1) Was he suffering from a mental illness at the time of the commission of the crime?

(2) Was that illness such as to prevent his knowing the wrongfulness of his act?

(3) Was the mental illness such as to render him substantially incapable of conforming his conduct to the requirements of the law he is charged with violating?

*Id.* at 727.

It is further explained that a "negative finding as to the first question or negative findings as to both the second and the third questions would require rejection of the insanity defense. An affirmative finding as to the first question, plus an affirmative finding as to either the second or third question, would require a jury verdict of 'not guilty' because of the defendant's lack of criminal responsibility." *Id.* Both the questions and the explanation thereof were approved by the Tennessee Supreme Court in *Graham*, 547 S.W.2d at 543.

■ The questions referred to above were not presented to the jury in the instant case, but that is by no means a fatal defect where the court accurately stated the law to the jury as delineated in *Graham*. This court finds that the jury was properly instructed.

■ The crux of the problem which faces this court is the third question, *supra*. There is no question that the defendant presented a compelling case of mental derangement at trial. Accordingly, the burden was shifted to the state to prove, beyond a reasonable doubt, that the defendant was sane at the time the crime was committed. This is not a light burden and

mere conjecture is not sufficient. There must be evidence in the record which, if believed by a jury, would form the basis for the conclusion that the defendant Stacy could conform his conduct to the dictates of the law on July 30, 1975. The third question is of central focus here because there was conflicting evidence as to whether the defendant could comprehend the wrongfulness of his acts. It is the conclusion of this court that the jury was fully justified in finding that William Earl Stacy, at the time of the murder, could distinguish right from wrong beyond a reasonable doubt. This is evidenced by the defendant's conduct as well as witnesses, including experts, for the defendant.

With the only issue here being whether the defendant could conform his conduct to the requirements of the law at the time of the killing, the testimony of the witnesses is hereinafter summarized. Indeed, the summary in Justice Henry's dissent cannot be improved upon, and the same will be adopted here.

## I.

### Mental Health Background

Defendant's background of hospitalization is significant. He was first admitted to the Forensic Services Division at Central State Hospital on August 13, 1974, from the state penitentiary, where he was serving a sentence for burglary and shoplifting. On October 18, 1974, he was transferred to Eastern State Hospital, from which he was discharged on October 23, 1974. On March 5, 1975, he was again admitted to Central State Hospital from the Criminal Court at Knoxville. On July 8, 1975, an incompetency and commitment hearing was conducted before the Honorable Richard R. Ford, Circuit Judge, and, as a result, on July 10, 1975, he was admitted to Eastern State Hospital for an indefinite period.

Judge Ford testified in this case as a witness for the defense. It was his testimony that based upon his personal observation on July 8, 1975, and on the information available, the defendant was seriously mentally ill. This was twenty-two days before the murder.[2]

On July 23, 1975, seven days before the murder, defendant was discharged from Eastern State Hospital without medication and without any provision for follow-up care.

## II.

### Lay Testimony

Defendant's sister, Kathy Stacy, testified that upon discharge defendant was so badly deteriorated that she thought he had escaped and called the hospital to confirm the fact of his discharge. She describes his conduct during the week between the discharge and murder as featuring giggling, laughing inappropriately, nervousness, shaking, staring, and having hallucinations of ghosts. On one occasion he turned out the lights so she could see the ghosts. He randomly broke dishes, walked naked about the house in front of his sister, her children and guests, and put an unloaded pistol against the head of her son and told him he would "blow his brains out." *On the day of the crime* he returned to her house with his "eyes all glittery," laughing, giggling and unable to stand still.

The testimony of Ira Minifee, an indicted accessory, and Regina Mack, both witnesses for the State, fully supports defendant's plea of insanity. Their descriptive testimony related to the *very day of the murder* and fully supports the testimony of Kathy Stacy. Further, it is consistent with and corroborative of the observations of the medical experts. In the very teeth of the crucial and undisputed testimony of these three witnesses, and with no evidentiary support in the record, the Majority asserts that "his conduct on or about the time of the murder does not compare even remotely with the conduct described when he was totally psychotic or out of touch with reality."

Reginald Leverette, a fellow prisoner for about four months following the murder, told of defendant's various acts of bizarre conduct, including a fixation that he was

a member of the President's Cabinet, waking from his sleep laughing, and walking about his cell naked with toilet paper sticking out his nose. His testimony states the defendant's condition in terms of thundering eloquence. He says defendant "ain't got good sense, he's crazy."

Stripped of all technical terminology this is precisely what the medical experts say. While this case is, in no sense, wholly dependent upon psychiatric testimony, the testimony of the medical witnesses gave thundering support to the defendant's plea of insanity.

### III.

### Medical Testimony

John T. Gerdes, Director of the Forensic Services Division at the Middle Tennessee Mental Health Institute,[3] a graduate psychologist with work completed on his doctorate at Vanderbilt, had personally observed and evaluated defendant on each of his three admissions. He confirms the lay witnesses on the glassy stare, the inappropriate laughter, the silly smile and other bizarre conduct.

He described the defendant thusly:

I considered him to be a *chronic* type mental patient *who has periods when his condition is in remission such that he doesn't appear as such outwardly psychotic but he's always mentally ill.* (Emphasis supplied).

The defendant called Dr. Frank L. Luton, the Assistant Superintendent for Clinical Psychiatric Services at the Middle Tennessee Health Institute. Dr. Luton has practiced psychiatry for forty-eight years. His career has been remarkable. His background includes graduation from the Medical School at Vanderbilt, four years of post-graduate training at Johns Hopkins, training in London, further training in Boston and as a teacher of psychiatry at Vanderbilt. He has been professor emeritus at Vanderbilt since 1963. We consider his testimony to be significant and conclusive.

Dr. Luton was thoroughly familiar with all records pertaining to defendant and had interviewed and evaluated him on numerous occasions. He diagnosed his condition as "schizophrenic, *chronic* undifferentiated type." The word "chronic" is defined in *Dorland's Medical Dictionary,* 25th Edition (1974) as "persisting over a long period of time." Thus, definitionally, no valid comparison may be made with a "cyclic, periodic or episodic" disorder such as we dealt with in *Forbes v. State,* 559 S.W.2d 318 (Tenn.1977).

Dr. Luton's testimony sheds substantial light on the medication question. He testified that "[w]hen he's not medicated, he becomes grossly psychotic, grossly ill, mentally ill." He testified that with medication defendant "behaves in a relatively normal fashion," but that he cannot be trusted to take his medication— "[h]e gets the idea that he doesn't need it any longer."

Basing his testimony on his own examinations he voiced the opinion that at the time of the murder defendant "was mentally sick, seriously, at that time." He testified that his condition was "chronic" and that it "goes back to the time when he committed the act and [that] at that time he was *not able to judge the nature of his act.*" (Emphasis supplied). Further, he was "not able to conform" his conduct to the requirements of the law. It is evident from Dr. Luton's testimony that defendant is dangerously psychotic when off his medication and yet he was released from the East Tennessee Mental Health Institute (Eastern State Hospital) without medication. As Dr. Luton phrased it, "the minute he quits taking his medicine, he's losing ground."

The testimony of Dr. Cyrus H. Higgs, Jr., at the July 8, 1975, hearing before Judge Ford appears in the record by agreement. Dr. Higgs was, at the time, Assistant Superintendent for Forensic Services at Central State Psychiatric Hospital. He had observed and evaluated defendant while at Central State. He testified to *chronic* schizophrenia and to the danger of a "relapse" without medication. Based on defendant's condition in December 1974 and assuming its continuance, Dr. Higgs felt that "*even under the McNaughten Rule that he would have an insanity defense.*"

Petitioner's last witness was Adolph Siegmann, formerly a psychiatrist at Central State Hospital, now at the Veteran's Administration Hospital in Murfreesboro. His testimony was based upon observations from April to August 1974, from March until July 1, 1975, and March 1976 to March 1977—all at Central State.

He testified unequivocally that defendant is mentally ill. He spoke of his "giggling in completely inappropriate ways," a condition defendant demonstrated to his sister and other lay witnesses from the date of discharge to the day of the murder. He said that this was "truly a sign of mental disease." He spoke of the smiles, the hallucinations and inappropriate behavior, also observed by the sister and other lay witnesses on the very day of the murder and during the preceding week.

According to Dr. Siegmann there had been symptomatic improvement in defendant's condition by July 1, 1975, when he was transferred to Eastern State, as a result of the "decisive" role played by medication. But "it was very important that his medication be maintained as Mr. Stacy's condition is apt to deteriorate if this is not done." If he were released without medication he "would disintegrate relatively soon again."

Dr. Siegmann testified that defendant was sent back to Eastern State for that institution to "supply support systems prior to discharge" and the "maintenance of medication." When asked if defendant could have been discharged into the community during the month of July 1975, the doctor responded: "I can only say that I was surprised when I heard about it."

Dr. Siegmann testified that defendant was aware of the wrongfulness of his action but said that "[t]he patient does not lose all semblance of what he was doing, which means in some ways a vague reality situation is almost always the awareness of a schizophrenic." He testified that defendant could not conform his conduct to the requirements of the law. He explained this by saying that a person in his condition is not "truly in command of his reasoning as a normal person." He becomes the victim of his affect, of which he is neither really aware nor, if he is aware, understands. He is bound to all kinds of impulsive actions which at times earlier he might renounce as "[in]appropriate."

Finally, Dr. Siegmann was asked "what happened to him during the last several years when he has not taken his medication," to which Siegmann responded, "[h]e became psychotic. *Dorland's* defines psychoses as being 'any major mental disorder of organic and/or emotional origin characterized by derangement of the personality and loss of contact with reality ....'"

The descriptions given by the sister and other lay witnesses take on new significance, in view of Dr. Siegmann's testimony:

> Q. Doctor, based on your knowledge of Mr. Stacy, if it were brought to your attention that on a given day he had been extremely nervous, could not stay still, had been laughing and giggling inappropriately, would that indicate to you that his state of schizophrenia was in remission or was it active?

> A. I would think it was a recurrence of disintegration.

This medical and lay testimony clearly establishes that defendant was not in remission on the date of the murder because he was not taking his medication, without which he was "basically mentally ill" and "grossly psychotic, grossly ill, grossly mentally ill," or, in the idiom, he "ain't got good sense, he's crazy." The Majority asserts that "[a]t the time of the homicide, however, he had been without medication for only a short period of time, if at all." The only conceivable purpose of this assertion is to cast doubt upon the absolute and undisputed fact that defendant was released without medication and was not on medication at the time of the murder.

601 S.W.2d at 699–702.

---

[2] Judge Ford also testified that he was not even notified of the release of this prisoner whom he had committed.

[3] The present name of Central State Hospital, a designation sometimes used in this opinion to conform to trial usage.

On this latter point, the former Justice is undoubtedly correct. There is not one shred of evidence in the record that Stacy was taking medication or even had access to medication. All the evidence, in fact, is directly to the contrary.

The State called a single witness in rebuttal, Dr. J. Frank Beasley, a psychiatrist employed by Lakeshore Mental Hospital. In response to a rambling, court-supplemented, lawyer-amended hypothetical question of questionable competence. Dr. Beasley testified that this hypothetical individual realized what he was doing and that it was wrong. All remaining portions of his testimony were properly stricken by the trial judge.

It is significant to note that Dr. Beasley was not asked a single question about remission. It is more significant that the State did not call a single psychiatrist from Central State or Eastern State, where the psychiatric treatment had been given defendant for a substantial portion of the year preceding the murder.

Normally, the missing witness rule would come into play and an unfavorable inference might be drawn from the State's failure to call an available witness possessing peculiar knowledge of the facts, relying instead on a witness less familiar with them. This is true especially in view of the fact that the State had within its keeping the psychiatrists who administered to defendant during his confinements at the state mental institutions. There is, however, no necessity for relying upon this inference. During oral argument the following colloquy between the Court and counsel for the State occurred:

The Court: Instead of calling one of those witnesses who had full knowledge of the facts, witnesses who were in the keeping of the state, the state elected to rely upon a hypothetical question propounded to a doctor who hadn't seen him ... Why didn't the state call a witness, one of its many witnesses who had some knowledge about this man?

Counsel: Well, the many witnesses who had, in fact, examined the defendant testified for the defendant....

We regard this as a devastating admission. The State's own experts clearly and conclusively establish the defendant's insanity defense, leaving the State in the position of relying upon a single doctor who had not even seen him. The defendant's only burden was to establish a prima facie case of insanity. He did so by offering conclusive proof of insanity; The State made no effort to carry its burden. 601 S.W.2d at 702.

The above-referenced exchange during oral arguments before the Supreme Court will in no way be considered as to the sufficiency of the evidence. But it is part of the record and is some indication of diligence on the part of the state in seeking expert testimony and finding an absence thereof to utilize in their favor.

Dr. Beasley's testimony is crucial to the state's cause. There is no evidence anywhere in the record and no testimony from any witness that Stacy could conform his conduct to the requirements of the law. Dr. Beasley was the witness who was to provide that testimony. But when the question was put to him, his answer was properly excluded by the court as being based, not upon the poorly-worded hypothetical question, but upon personal knowledge. The following is the sole attempt by the state to reach the second prong of the *Graham* test:

Q. Now, doctor, taking that same set of facts, and based on those same assumptions, I will ask you further if you have an opinion as to whether or not the person with the gun could conform his conduct to the requirements of law at that time? Do you have an opinion as to that, doctor?

A. Yes, I think he could have.

Q. You say you have an opinion. State what that opinion is and why?

A. Yes, he could have.

Q. And do you state that within reasonable medical certainty, taking that hypothetical question?

A. Yes.

Q. And for what reasons do you base that opinion, doctor?

A. I base that on reviewing his chart from 1974—

MR. KURTZ: Well, I object and I move to strike his whole testimony if he's basing it on his personal knowledge of this individual—

THE COURT: Wait a minute. Are you basing your opinion on the individual or on the hypothetical question presented to you? Which?

MR. JONES: Your Honor—

THE COURT: Wait a minute, wait a minute. Are you basing your decision, your testimony here today on your personal observations of the individual or on the hypothetical questions submitted? Which?

THE WITNESS: This is somewhat difficult to answer. It sounds like, from what you've told me in this hypothetical situation, that the robbery was planned, attempted—

THE COURT: That's not what I'm asking. Are you basing your answer to the question asked on the hypothetical question as given or on your having observed the individual at one time, because you referred to the individual and his record?

THE WITNESS: I am basing the first part on your hypothetical question and on the second part, on his past history.

MR. KURTZ: I still don't understand his answer.

THE COURT: His answer is that he could have conformed to the requirements of the law.

MR. KURTZ: Well, your Honor, I move to strike that answer—

THE COURT: And he's basing that, he says, on his personal observations and on the records of the defendant.

MR. KURTZ: Well, it's mixed with the hypothetical, so I move to strike his answer completely and ask the jury to disregard that.

MR. JONES: Your Honor, he has given his opinion and—

THE COURT: I know, but he's basing it on something other than the hypothetical question that you asked him and that creates a problem.

Q. Well, doctor, let me ask you this, do you base your—

MR. KURTZ: Would the Court rule on my objection?

THE COURT: I'm going to rule at this time to strike whatever he says about the second portion of the Graham rule.

MR. KURTZ: Thank you, your Honor.

A. The thing is that you are asking me if a total stranger, no one I know, could walk into a bus station and attempt a robbery—

THE COURT: Well, you have already answered that, that in your opinion, you are saying that you believe that individual realized what he was doing?

THE WITNESS: Yes. It shows organized thinking.

THE COURT: You are all right there but I sustained the motion with respect to the second portion of that.

The doctor's response to the critical question was stricken, but no cautionary instruction was requested or given to the jury. This court affirmatively *searched* the record for evidence, direct or circumstantial, that the state proved that the defendant could conform his actions to the law beyond a reasonable doubt. Not only did the state not prove it beyond a reasonable doubt, there is no proof whatsoever on that essential element of the offense.

There can be no doubt in this case that the burden shifted to the prosecution to prove sanity. Therefore, even if the jury disbelieved the defense witnesses entirely, that would leave the matter in equipoise— no evidence for the defense and no evidence for the prosecution. With the presumption of sanity removed, the state cannot prevail. While ordinarily expert opinion testimony is not conclusive even where it is uncontradicted, *United States v. Harper*, 450 F.2d 1032, 1042 (5th Cir. 1971) and expert testimony is in no way binding upon a jury in Tennessee, *Edwards v. State*, 540 S.W.2d

641, 647 (Tenn.1976), still, with a case in the posture of the one at bar, it is impossible for a jury to disregard unrebutted evidence of insanity.

In a case in which the trial was similar to Stacy's, the Fifth Circuit Court of Appeals wrote concerning the same test as *Graham* but referred to as the *"Blake* test":

> We have stated that the nature and quantum of rebuttal evidence sufficient to present a jury question is to some degree determined by the strength of the case for insanity. [Citation omitted.] The defendant presented not slight evidence, but substantial evidence, of his insanity at the time of and with respect to the offenses charged. In rebuttal, the government presented one expert witness whose testimony did not actually negate any part of the *Blake* test. As we held in *Brock*, the government must produce something more in order to pass appellate muster.
>
> Here the evidence presented would not permit the jury to "go either way;" there were no "material variations between the experts themselves." [Citations omitted.] ... We conclude that the government did not present sufficient rebuttal evidence to present a jury question on the issue of the defendant's insanity. In a criminal case, it is not sufficient for the government to produce evidence from which the jury could conclude that the defendant was sane by a preponderance of the evidence. In order to present a question for the jury, the government must produce evidence sufficient to convince a reasonably minded juror that the defendant was sane beyond a reasonable doubt. The government failed in that attempt, and thus the convictions cannot stand.

*United States v. Bass*, 490 F.2d 846, 851–52 (5th Cir. 1974).

In Stacy's case, the state's rebuttal was not insufficient; it was nonexistent. That places the case in the same posture as *United States v. Burks*, 547 F.2d 968 (6th Cir. 1977), *rev'd on other grounds*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). There, the

Sixth Circuit reversed a conviction where three doctors testified that the defendant could not conform his conduct to the requirements of the law and the government failed to offer rebuttal evidence. The Supreme Court only reversed as to the ordering of a new trial, holding that double jeopardy barred such a trial.

Mention should be made of another rule of criminal law with regard to sanity in Tennessee. In the case of *Forbes v. State*, 559 S.W.2d 318 (Tenn.1977) it was held that "when any defendant, suffering from a mental illness that is cyclic, periodic or episodic in nature, characterized by periods of remission, interposes a plea of not guilty by reason of insanity, it is incumbent upon him to make out a prima facie case of insanity by offering evidence of nonremission at the time of the commission of the crime." *Id.* at 328–29. Stacy's illness might be fairly characterized as being in remission provided that he is under medication. There is, again, no evidence in the record that Stacy was taking, or even had access to, the therapeutic drugs. Dr. Siegmann testified that lay witnesses' descriptions of Stacy on the day of the killing would indicate a "recurrence of disintegration."

However, it is questionable whether the *Forbes* rule applies to the *Graham* test. *Forbes* was tried under the old *McNaughten* rule in Tennessee and the Supreme Court specifically refused to apply the *Graham* standard in *Forbes*. Even if it does apply, however, Stacy made a prima facie showing that he was not in remission. Secondly, if one accepts that he could not conform his conduct to the dictates of the law, he was necessarily not in remission. If the jury chose to disbelieve the latter conclusion, the prima facie showing shifted the burden to the state and, in the absence of rebuttal evidence, the presumption of insanity remains. In either eventuality, *Forbes* cannot be used in this circumstance to shore up an otherwise improper verdict of the jury.

Finally, the court has carefully considered the basis for a finding of sanity proved beyond a reasonable doubt which the three-

person majority of the Tennessee Supreme Court utilized. It is believed that Justice Henry once again correctly characterized those conclusions and he will be quoted once again.

[T]he majority seem[s] to rest their conclusion of sanity on four aspects of this case. First, they say he was aware of what he had done, but we point out that awareness does not meet the second prong of the *Graham* rule, i.e., the ability to conform his conduct to the requirements of the law.

Next, they say he sought to avoid apprehension and evaded capture for several weeks. The short and simple answer to this is that any fool faced with fear and foreboding can flee and hide. Such is the nature of even a wild beast.

Thirdly, they say he had only a short history of mental illness. The test is not the duration but the fact of legal insanity.

Lastly, they say he was "highly intelligent." There is no insistence that Stacy is stupid—just that he was insane.

601 S.W.2d at 703.

In summary, then, the "due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, 571 (1979). Here, an essential element of the offense, i.e., that the defendant could conform his conduct to the requirements of the law, was missing. It was simply absent from the jury's consideration. Asking the question posed by *Jackson,* "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979), the answer must be that they could not. The court stands with *Jackson* under one arm and *Stacy* under the other; they cannot be resolved consistently. Accordingly, upon the record evidence adduced at trial and presented to this court, it is held that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. The petitioner is entitled to be granted the writ of habeas corpus.

In view of the foregoing disposition of this matter, the remaining grounds raised in support of the petition will not be addressed.

The writ will automatically be stayed pending appeal of this decision.

An appropriate order will be entered.